## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| KATHERINE VEILLEUX, and JENNIFER CHON, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs | ) |
| v. | )      Civil Action No. _____ |
| | ) |
| ELECTRICITY MAINE, LLC, PROVIDER POWER, LLC, SPARK HOLDCO, LLC, KEVIN DEAN, and EMILE CLAVET, | ) ) ) ) |
| | ) |
| Defendants | ) |

### CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

NOW COME the Plaintiffs, Katherine Veilleux and Jennifer Chon, individually and on behalf of all others similarly situated, and allege the following as their Complaint against Defendants Electricity Maine, LLC, Provider Power, LLC, Spark HoldCo, LLC, Kevin Dean, and Emile Clavet:

### INTRODUCTION

1.      Between 2011 and 2014, Defendant Electricity Maine, LLC, enrolled nearly 200,000 Maine households and small businesses in its electricity-supply services with the promise of substantial cost savings.  Instead of decreasing consumers' electricity bills, however, Electricity Maine, through Defendants' fraud and deception, cost Maine ratepayers at least $35 million.  This civil action seeks to remedy the significant financial harm caused by Defendants' scheme.

1

**PARTIES**

2.      Plaintiff Kathleen Veilleux resides in Farmingdale, Maine.

3.      Plaintiff Jennifer Chon resides in Scarborough, Maine.

4.      Defendant Electricity Maine, LLC, is a Maine limited liability with a place of business in Auburn, Maine.  Until May 3, 2016, Electricity Maine, LLC, was wholly owned by Defendant Provider Power, LLC.

5.      Defendant Provider Power, LLC, is a Maine limited liability company with a place of business in Auburn, Maine.  Although Provider Power, LLC, and Electricity Maine, LLC, are separate corporate entities, they operated as a cohesive unit under the name Electricity Maine until May 3, 2016.  Throughout the Complaint, Defendants Electricity Maine, LLC, and Provider Power, LLC, are collectively referred to as Electricity Maine unless otherwise noted.

6.      Defendant Spark Holdco, LLC, is a Delaware limited liability company with a principal place of business in Houston, Texas.  On May 3, 2016, Spark HoldCo purchased all outstanding membership interests in Electricity Maine, LLC, from Provider Power, LLC.

7.      Defendant Kevin Dean is an individual residing in Maine.  Kevin Dean is a controlling member of Provider Power, LLC.  Following Electricity Maine's sale to Spark HoldCo on May 3, 2016, Kevin Dean, who remains an Electricity Maine employee or consultant, shares control of Electricity Maine with Emile Clavet and Spark Holdco.

8.      Defendant Emile Clavet is an individual residing in Maine.  Emile Clavet is a controlling member of Provider Power, LLC.  Following the sale of Electricity Maine, LLC, to Spark HoldCo on May 3, 2016, Emile Clavet, who remains an Electricity Maine employee or consultant, shares control of Electricity Maine with Kevin Dean and Spark Holdco.

## JURISDICTION AND VENUE

9.     This Court has federal-question jurisdiction over Plaintiffs' and Class Members' claims made pursuant to 18 U.S.C. § 1961 et seq.  Because the Plaintiffs' state law claims arise out of the same case or controversy, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(1).

10.     Because all Defendants except Spark HoldCo, LLC, are residents of Maine and because a substantial portion of the events and omissions giving rise to Plaintiffs' and Class Members' claims occurred within the State of Maine, venue is appropriate in the United States District Court, District of Maine.

## GENERAL ALLEGATIONS

11.     Prior to 2000, regulated utilities dominated Maine's electric power industry and enjoyed a complete vertical monopoly in the generation, transmission, and supply of electricity to Maine consumers and businesses.

12.     In 2000, the Legislature, in enacting The Restructuring Act, 35-A M.R.S. § 3201 et seq., transformed the industry to permit private non-regulated firms to compete with utility providers in the electricity supply market.   Under The Restructuring Act, utility suppliers continue to supply electricity to Maine consumers and businesses on terms known as standard-offer service.  Standard-offer service guarantees that all Maine ratepayers can receive electricity service at a fair rate that is approved by the Maine Public Utilities Commission.  At the same time, The Restructuring Act permits competitive electricity providers ("CEPs") to enter the market and supply power in competition with the utility-providers.

13.     Following the enactment of 35-A M.R.S. § 3201, CEPs initially marketed their services only to industrial and commercial customers.  Businesses with significant electricity

costs used the CEP market to hedge and negotiate fixed rates, resulting in more predictable long-term costs.  The residential and small-business electricity market, however, was widely seen by CEPs as unprofitable—the margins too thin and the cost of transacting with each consumer too high.  Entering the market, moreover, proved difficult.  Electricity is a homogeneous good that consumers purchase for only one reason—price.  Without the ability to significantly undercut utility-providers, whose power supply services are known as the "standard offer" and are set by the Maine Public Utilities Commission, CEPs struggled to gain market share in the residential and small-business electricity supply market.

14.      Despite the economic challenges facing CEPs in the residential electricity market, Auburn-based Electricity Maine, led by Emile Clavet and Kevin Dean, entered the residential and small-business electricity supply market in 2011, with remarkable success.  In 2011, for example, CEPs held only a sliver of the residential supply market—0.05% of all Maine residential and small-business customers.  Less than two years later, however, Electricity Maine alone had converted almost 200,000 customers to its services.

15.      Defendants credited Electricity Maine's success to innovative marketing and a unique business model.  They touted Electricity Maine's ability to compete on price, promising to beat the utility providers' standard-offer price under any circumstances and describing Electricity Maine's business as simple and straightforward—representing to potential customers that "there is no catch, no gimmicks" and that its promised low rates were not "too good to be true."

16.      As a business, however, Electricity Maine succeeded only because of fraud and deception.  And once Electricity Maine failed to deliver on its promise to "always beat the standard-offer," the obvious flaws in its operations were exposed.  Not only was Electricity

Maine's product "too good to be true"—contrary to its representations—but its remarkable success was possible only through a fraudulent scheme that has two components. First, Electricity Maine enrolls customers through the false and misleading promise of price savings compared to the utilities' standard-offer rate. Second, after enrolling residential electricity customers at artificially-low promotional rates, Electricity Maine transfers customers, with little or no notice, to significantly higher long-term rates that greatly exceed the standard-offer rate— and from which customers cannot escape without paying a $100 early-termination fee.

**A.      Fraudulent and Misleading Advertising and Promotion**

17.      Over a less-than-two-year period—from mid-2011 through March 2013— Defendants, through radio, television, internet, print, and other forms of advertising and marketing, managed to capture nearly one-third of the Maine residential and small-business electricity supply market by representing that Electricity Maine's services offered consumers significant price savings compared to the standard-offer and encouraging consumers to abandon their utility-provided electricity supply services. The following are examples of Defendants' fraudulent and misleading advertising and promotional activities:

a.  In August 2011, Emile Clavet made statements to the Lewiston Sun Journal that were published on August 14, 2011. These statements represented that Electricity Maine offered electricity rates that "will always beat the standard offer. You'll never, ever pay more than the standard offer . . . ."

b.  In the same August 14, 2011 Lewiston Sun Journal article, Electricity Maine customer service project manager Danielle Beckwith represented that "there is no catch and no gimmicks," "[t]here's just a better rate."

c.  Emile Clavet and Kevin Dean appeared on television show 207TV in 2012 and represented that Electricity Maine's prices were lower than the standard offer, that Electricity Maine customers could save over $130 a year, that Electricity Maine customers would be notified of any price increases, and that Electricity Maine's services did not come with a "catch,"—"there really isn't," Dean represented.

d.  Throughout 2012 and through March 2013, Electricity Maine ran a series of television advertisements on major network channels in which Electricity Maine spokeswoman Kiley Bennet represented that Electricity Maine's electricity supply services were lower than the standard-offer rate.   The advertisements stated "if your electricity bill says standard offer, you're paying too much" and "[c]hange now and save every month."

e.  In late September or early October 2012, Kevin Dean made statements to the Bangor Daily News regarding Electricity Maine's prices that were published on October 2, 2012.  He maintained that Electricity Maine will always offer the lowest price.

f.  On January 7, 2013, Electricity Maine distributed the following talking point to at least four Maine radio station syndicates—Cumulus Media, Blueberry Broadcasting, Portland Radio Group, and Town Square Media—for thirty-second on-air promotions:  "Nearly 2 hundred thousand Mainers can't be wrong.  Electricity Maine was the first and now the largest competitive electricity supplier provider in Maine.  In 2013 Electricity Maine customers will combine to save 6 point 8 million dollars."  Electricity Maine distributed the same talking point on January 18, 2013.

g.  On January 18, 2013, Electricity Maine distributed talking points to at least the same four Maine radio station groups representing that "In 2013 customers will combine to save 6.8 million!"

h.  On February 14, 2013, Electricity Maine distributed talking points to at least the same four Maine radio station groups, telling Maine residential electricity customers "[j]ust grab your power bill, if on page 2 it says 'Standard Offer' you're paying too much."

i.  Provider Power has represented on its website since at least August 5, 2016, and continues to represent, that it has "SAVED RESIDENTS MILLIONS OF DOLLARS."

j.  As of November 1, 2016, Provider Power represented on its YouTube channel that "200,000 customers have switched to Electricity Maine, saving over $14 million in energy costs."

18.     Lured to its website on the promise of bargain electricity prices, customers enrolled in Electricity Maine's services by entering personal and utility-provider information in a simple interactive form that contains no warnings, disclosures, or notices.  To sign up, there is no component that actively requires consumers to agree or consent to a set of terms and

conditions—after entering the required information, soon-to-be Electricity Maine customers merely click "SUBMIT FORM."

19.    The combination of fraudulent and misleading marketing and promotion, and artificially low promotional rates, allowed Electricity Maine to rapidly gain significant market share in the Maine residential and small-business electricity supply market.  These marketing practices were so effective that, in 2012, Electricity Maine became the fastest growing energy company in the country.

20.    Based on Defendants' misrepresentations, both Plaintiffs enrolled in Electricity Maine's electricity supply services in 2012.

21.    Electricity Maine's promise of always beating the standard offer proved short lived, however.  After enrolling nearly 190,000 customers through mid-2012, Electricity Maine began to significantly increase its rates in early 2013.  When customers' introductory-rates expired, they were automatically enrolled at substantially higher rates with little, or no, notice. These prices greatly exceeded, and later doubled, the standard-offer rate.

22.    Because electricity is an extremely homogenous good, Electricity Maine's business model is entirely dependent on its ability to compete on price and promise price saving compared to the standard-offer rate.  For its business to succeed, therefore, Defendants were motivated to misrepresent the benefits of Electricity Maine's product.

23.    Because of Defendants' intimate knowledge of the residential power industry and its economics, Defendants were aware that their representation of guaranteed price savings was false and that recouping Electricity Maine's investment in customer recruitment was not possible without charging more than the standard offer.  They were aware that Electricity Maine could not

possibly always beat the standard offer—or even beat the standard offer for a significant period of time.

24.     Because of the economics that CEPs face, they can never compete with utility providers on a long-term basis.  Electricity Maine borrows, or hedges, electricity from wholesale electricity providers, resells that electricity to residential and small-business customers, and finally repays the wholesalers.  Without the ability to automatically reenroll customers—and reenroll them at higher rates when wholesale electricity prices are rising—Electricity Maine would quickly fail.  Utility providers, on the other hand, do not rely on electricity supply to profit and cannot raise rates without Public Utilities Commission approval.  Therefore, when power prices fluctuate, CEPs are distinctly disadvantaged when competing on price with utility providers.

25.     Despite its inability to compete in the long term, Defendants proceeded to market Electricity Maine's residential electricity services as providing significant cost savings compared to standard-offer service.  In doing so, Defendants knew that, for Electricity Maine to succeed, it must reenroll customers at prices that greatly exceeded the standard offer.  At the same time, Defendants' advertising omitted any information regarding the risk of price increases.

**B.     Reenrollment Scheme**

26.     By late 2012 or early 2013, Electricity Maine had enrolled almost 200,000 residential and small-business electricity customers.

27.     At that same time, Electricity Maine's earliest-customers' year-long or eighteen-month-long contracts began to expire.

28.     Before Electricity Maine's customers' contracts expired, it was contractually obligated to inform its customers in a "Confirmation Letter" that they, pursuant to an auto

renewal provision, were being reenrolled in a long-term contract.  Additionally, until January 26, 2015, Maine Public Utilities Commission regulations required that CEPs provide renewal notices between 30 and 60 days in advance of automatic renewal "in the customer's bill or in a separate document issued with the customer's bill."

29.     To conceal from customers that they were being reenrolled at astronomical rates, Defendants' did not send letters warning customers of a change in service; instead, Defendants— if they sent any notice at all—provided notice by email.  Defendants did not include the required notice in customers' bills or in a document issued with customers' bills.

30.     To further confuse customers, moreover, email-renewal notices were sent from unrecognizable email addresses that went directly to customers' spam folders.  Defendants' knew that their renewal emails were landing in customers' spam folders and that customers were not receiving notice.

31.     Aware that customers were not receiving auto renewal notices because email notices were going to customers' spam folders; because renewal notices were sent from email addresses unaffiliated with Electricity Maine; or because customers could not understand the notices that they did receive, Defendants began reenrolling Electricity Maine's initial group of nearly 200,000 residential electricity customers at rates that greatly exceeded the standard offer.

32.     For example, on October 1, 2014, Electricity Maine sent Plaintiff Jennifer Chon an email stating that her contract would be renewed.  The email stated: "To protect you from rising rates, we have secured a competitive, 24 month fixed contract for you at $0.11394 (11.39 cts.)/kWh, ending on you meter date in December, 2016.  There is no action required on your part."

33.    Electricity Maine's October 1, 2014, email never appeared in Plaintiff Chon's inbox.  She recovered it from her spam folder in 2016.  Electricity Maine was aware, and informed Plaintiff Chon, that its auto renewal notices consistently went directly to customers' spam folders.  The standard-offer rate at the time was approximately 7.6 cts. /kWh or forty-three-percent lower than Electricity Maine's "competitive" rate, at which Plaintiff Chon was reenrolled in without her knowledge.

34.    Defendants reenrolled Electricity Maine customers at significantly higher prices for two reasons: (1) to sustain Electricity Maine's business and recoup its promotional investment, Defendants needed sufficient aggregate value from Electricity Maine's residential customer contracts to provide collateral to wholesale electricity providers—who lend wholesale electricity to Electricity Maine using its customers' outstanding contractual obligations as security—and (2) because Defendants realized that they could significantly increase Electricity Maine's profits by gouging unsuspecting customers.

35.    Because electricity is such a homogeneous good, a reenrollment system that actually informed customers that their new electricity supply rate would substantially exceed competitors' pricing—that is, the standard offer—would have put Electricity Maine out of business in 2013.  Electricity Maine's continued operation is only feasible through deception and fraud.

36.    As customers saw their bills skyrocket, Electricity Maine's growth faltered.  But the damage had already been done.  With at least twenty-percent of Maine's residential electricity consumers as current customers—who cannot escape without paying a $100 termination fee—Defendants continue to charge prices greatly exceeding the standard offer.

And instead of saving Mainers money, Electricity Maine, through 2015, has increased its customers' electricity bills aggregately by at least $35 million.

## CLASS ACTION ALLEGATIONS

37.    Plaintiffs bring this action as a class action on behalf of themselves and all other persons and entities similarly situated (Class or Class Members).

38.    The Class includes:

All Electricity Maine residential and small-business customers who enrolled in Electricity Maine's electricity supply services at any point in time before March 8, 2013.

Excluded from the Class are: (1) Defendants, their employees, officers, directors, assigns, successors, and any entity in which they have a controlling interest; (2) the United States District Court Judge to whom this case is assigned and any member of that Judge's immediate family; and (3) the Plaintiffs' and Class Members' law firm, Hallett, Zerillo & Whipple, P.A., its attorneys, staff, and their immediate family members.

39.    The Class is comprised of over 100,000 residential electricity customers making joinder impractical.  (Ex. A at 5).  The disposition of Class Members' claims in a single class action will provide substantial benefits to all parties and to the Court.

40.    There are numerous questions of law and fact common to the Plaintiffs and the Class, including:

a.   Whether Defendants are engaged in trade or commerce;

b.   Whether Defendants' advertising and business practices are fraudulent, misleading, unfair, or deceptive;

c.   Whether Defendants falsely represented, failed to disclose, or concealed, the cost of Electricity Maine's services;

d.   Whether Defendants withheld material information from consumers;

e.   Whether Defendants' misconduct provides any benefit to consumers;

f.   Whether Defendants' misconduct is reasonably avoidable by consumers;

g.   Whether Defendants' conduct caused, likely caused, or could reasonably be found to have caused, substantial injury to consumers;

h.   Whether RICO Defendants, through the conduct of an enterprise, engaged in a pattern of racketeering by repeatedly engaging in mail and wire fraud;

i.   Whether Electricity Maine and Provider Power constitute an enterprise within the meaning of 18 U.S.C. § 1961(4);

j.   Whether RICO Defendants committed mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343 by using interstate mail and wires to execute and further their fraudulent scheme;

k.   Whether RICO Defendants' misconduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5);

l.   Whether RICO Defendants' violations of 18 U.S.C. § 1961 et seq. caused Plaintiffs and Class Members to suffer economic harm;

m.   Whether Electricity Maine breached contractual obligations to Plaintiffs and Class Members by failing to send confirmation letters before auto enrolling customers for additional services;

n.   Whether Plaintiffs' and Class Members' contracts with Electricity Maine should be rescinded;

o.   Whether Defendants had a duty to the Plaintiffs and the Class not to engage in deceptive or unfair conduct;

p.   Whether Defendants acted negligently;

q.   Whether Defendants intentionally or recklessly misrepresented or omitted material information;

r.   Whether Defendants profited and benefited from Plaintiffs' and Class Members' payments for residential electricity services;

s.   Whether Defendants voluntarily accepted and retained Plaintiffs' and Class Members' payments;

t.   Whether Defendants were unjustly enriched by accepting Plaintiffs' and Class Members' payments;

u.  Whether Defendants' should make full restitution to Plaintiffs and all
Class Members;

41.     These common questions of law and fact predominate over any questions
affecting only individual Class Members.  The factual basis of Defendants' misconduct is
common to all Class Members and represents a universal thread of deceptive, fraudulent, and
unfair practices that resulted in a common injury to all Class Members, making class
adjudication superior to any other available method of resolution.

42.     Without class certification, prosecution of separate actions by individual members
of the Plaintiff Class—who have not, to Plaintiffs' knowledge, commenced any litigation against
Defendants—would be prohibitively expensive and would create the risk of inconsistent or
varying adjudications with respect to individual members of the Class.  Because of the cost of
bringing individual actions, Class Members will, absent certification, continue to incur damages
and Defendants' misconduct will continue unmitigated.

43.     Similarly, the Plaintiffs' claims are typical of the claims of the Class, and
common questions of law and fact predominate, because the Plaintiffs, like all Class Members:

a.  Were exposed to the same unfair, deceptive, fraudulent and misleading conduct
and business practices;

b.  Purchased Electricity Maine's services because of Defendants' misconduct;

c.  Were automatically reenrolled in Defendants' services without proper notice;

d.   Have been damaged by Defendants' misconduct; and

e.  Seek redress under the same legal theories.

44.     Plaintiffs will fairly and adequately represent and protect the interests of the
Class.  Plaintiffs have retained experienced counsel who are committed to prosecuting this action

vigorously and who have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interests that are materially adverse to those of the Class.

45.     Because most Class Members reside in Maine and Defendants' wrongful conduct occurred primarily in Maine, it is desirable for the Class Members to concentrate all claims in the United States District Court, District of Maine.

46.     WHEREFORE, the Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court certify the proposed class.

## COUNT I
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") – 18 U.S.C. § 1962(c)

47.     Plaintiffs repeat and reallege the allegations in every previous paragraph of this Complaint as if fully set forth herein.

48.     Beginning in 2011 and continuing until the present, RICO persons and defendants Kevin Dean, Emile Clavet, and Spark Holdco (RICO Defendants), participated in, and conducted, the conduct of an enterprise, through pattern of racketeering, by repeatedly engaging in mail and wire fraud.  RICO Defendants' violations of 18 U.S.C. § 1962(c) caused Plaintiffs and Class Members to suffer significant economic harm.

**A.     Enterprise**

49.     Electricity Maine, LLC and parent company Provider Power, LLC comprise the Electricity Maine Promotional Enterprise ("Enterprise").  Together, these entities constitute an enterprise or an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

50.     Both members of the Enterprise share the common purpose of conducting RICO Defendants' fraudulent, deceptive, and misleading advertising scheme to promote Electricity Maine's electricity supply services and induce Plaintiffs and Class Members to purchase those

services instead of standard-offer electricity services or the services of other CEPs.  At the direction of the RICO Defendants, the Enterprise has endeavored to achieve the common purpose since 2011, and has succeeded in enrolling nearly 200,000 residential and small-business electricity customers in Electricity Maine's services.

51.    Electricity Maine and Provider Power, as members of the Enterprise, are completely and systematically intertwined.  Functioning as a single unit, they share employees, ownership, management, facilities, and infrastructure, to achieve the Enterprise's common purpose.

52.    Under the direction of RICO Defendants, the Enterprise functions through a hierarchical corporate decision-making structure.  The Enterprise does not make decisions on an ad-hoc basis and its members, similarly, do not operate at arms-length; instead, they function as a cohesive unit to achieve the Enterprise's common purpose.

53.    The Enterprise is owned by, and structured to function under the direction and control of, the RICO Defendants.  RICO Defendants participated in the Enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of interstate wire and mail communications to execute a scheme to defraud Plaintiffs and Class Members— all in violation of 18 U.S.C. § 1962(c).

54.    Beginning in 2011, and until May 3, 2016, RICO Defendants Emile Clavet and Kevin Dean exclusively controlled the Enterprise.  On May 3, 2016, Spark HoldCo purchased the Enterprise from Clavet and Dean, who remain employees of, or consultants to, Electricity Maine.  All three RICO Defendants currently share control of the Enterprise.

55.    RICO Defendants are distinct from both members of the Enterprise and from the Enterprise itself.  RICO Defendants Emile Clavet and Kevin Dean are natural persons distinct

15

from the Enterprise.  RICO Defendant Spark HoldCo is a distinct corporate entity from either Enterprise member and from the Enterprise itself.  Unlike the typical relationship between a parent corporate entity and its subsidiary, Spark HoldCo directly controls the Enterprise by providing multi-million-dollar incentives to Electricity Maine and Provider Power to ensure that the Enterprise succeeds in its scheme to enroll additional residential and small-business electricity customers.  Specifically, Spark HoldCo promised the Enterprise a $9-million-dollar success fee for enrolling a certain number of new electricity supply customers through the below-described racketeering activities.

56.    Without RICO Defendants' fraudulent scheme, the Enterprise could stand alone as a legitimate—albeit unsuccessful—business.

**B.    Specific Acts of Mail and Wire Fraud**

57.    RICO Defendants, through the Enterprise's conduct, committed numerous acts of mail and wire fraud in violation of 18 U.S.C. § 1341 and 1343 by using interstate mail and wires with specific intent to execute their fraudulent scheme.  RICO Defendants' scheme is reasonably calculated to deceive persons of ordinary prudence and comprehension in order to part Plaintiffs and Class Members from their money and to induce them to surrender their legal rights.  The scheme departs from any known standard of fair play and honest dealing.  The scheme includes nondisclosure, deliberate falsehoods and misleading communications.  Each nondisclosure, misrepresentation, and misleading statement is embedded in a pattern of deception and fraud reasonably calculated to induce reliance.

58.    Defendants' specific acts of mail and wire fraud include, but are not limited to, the following statements:

    a.  On August 2011, Emile Clavet made statements to the Lewiston Sun Journal
        that were published on August 14, 2011.  These statements represented that

16

Electricity Maine's electricity rates "will always beat the standard offer. You'll never, ever pay more than the standard offer . . . ." This statement was published using interstate mail and wire communications in that it was published on the Lewiston Sun Journal's website and mailed to Lewiston Sun Journal subscribers.  In causing Electricity Maine to make these statements, RICO Defendants were aware, and intended, that the Lewiston Sun Journal would publish the fraudulent and misleading statement on or about August 14, 2011, on its website using interstate wires.

b.   In the same August 14, 2011, Lewiston Sun Journal article, Electricity Maine's customer service project manager represented that "there is no catch and no gimmicks," "[t]here's just a better rate."  This statement was published using interstate mail and wire communications in that it was published on the Lewiston Sun Journal's website and mailed to Lewiston Sun Journal subscribers.  In causing Electricity Maine to make these statements, RICO Defendants were aware, and intended, that the Lewiston Sun Journal would publish the fraudulent and misleading statement on or about August 14, 2011, on its website using interstate wires.

c.   Emile Clavet and Kevin Dean appeared on television show 207TV in early 2012 and represented that Electricity Maine's prices were lower than the standard offer; that Electricity Maine Customers could save over $130 a year; that Electricity Maine customers would be notified of any price increases; and that Electricity Maine's services did not come with a "catch,"—"there really isn't" Dean represented.  This statement was published using interstate wire communications in that it was televised.  In making these statements on live television, RICO Defendants were aware, and intended, that Portland, Maine NBC affiliate WCSH Channel 6 would transmit the fraudulent and misleading statement in early 2012.  RICO Defendants, through Electricity Maine, later used interstate wire communications on February 22, 2012, to publish a recording of Clavet's and Dean's appearances on 207TV on Electricity Maine's YouTube channel.

d.   Throughout 2012 and through March 2013, Electricity Maine ran a series of television advertisements on major network channels in which Electricity Maine spokeswoman Kiley Bennet represented that Electricity Maine's electricity services were lower than the standard-offer rate.   The advertisements stated "if your electricity bill says standard offer, you're paying too much" and "[c]hange now and save every month."  In causing Electricity Maine to make these fraudulent and misleading statements, RICO Defendants were aware and intended that Portland, Maine NBC affiliate WCSH Channel 6 and other Maine network television affiliates would use interstate wire communications to transmit Kiley Bennet's statements.

e.   In late September or early October 2012, Kevin Dean made statements to the Bangor Daily News regarding Electricity Maine's prices that were published

on October 2, 2012.  He maintained that Electricity Maine "will always offer the lowest price."  This statement was published using interstate mail and wire communications in that it was published on the Bangor Daily News website and mailed to Bangor Daily News subscribers.  In causing Electricity Maine to make these statements, RICO Defendants were aware, and intended, that the Bangor Daily News publish the fraudulent and misleading statement on or about October 2, 2012, on its website using interstate wires.

f.  On January 7, 2013, Electricity Maine distributed the following talking point to at least four Maine radio station syndicates—Cumulus Media, Blueberry Broadcasting, Portland Radio Group, and Town Square Media—for a thirty-second on-air promotion:  "Nearly 2 hundred thousand Mainers can't be wrong.  Electricity Maine was the first and now the largest competitive electricity supplier provider in Maine.  In 2013 Electricity Maine customers will combine to save 6 point 8 million dollars."  Electricity Maine distributed the same talking point on January 18, 2013.  These statements were transmitted using interstate wire communications and subsequently made part of radio broadcasts.  In causing Electricity Maine to make these statements, RICO Defendants were aware, and explicitly instructed, that the radio groups transmit the fraudulent and misleading statements in thirty-second advertising clips using interstate wires.

g.  On January 18, 2013, Electricity Maine used email to distribute talking points to at least the same four Maine radio station groups representing that "In 2013 customers will combine to save 6.8 million!"  These statements were transmitted using interstate wire communications and subsequently transmitted as part of radio broadcasts. These statements were transmitted using interstate wire communications and subsequently made part of radio broadcasts.  In making these statements, RICO Defendants were aware, and explicitly instructed, that the radio groups transmit the fraudulent and misleading statements in thirty-second advertising clips using interstate wires.

h.  On February 14, 2013, Electricity Maine distributed talking points to at least the same four Maine radio station groups telling Maine residential electricity customers to "Just grab your power bill, if on page 2 it says 'Standard Offer' you're paying too much."  These statements were published using interstate wire communications in that they were part of a radio broadcast.  These statements were transmitted using interstate wire communications and subsequently made part of radio broadcasts.  In making these statements, RICO Defendants were aware, and explicitly instructed, that the radio groups transmit the fraudulent and misleading statements in thirty-second advertising clips using interstate wires.

i.  As of November 1, 2016, Provider Power represented on its website since at least August 5, 2016, and continues to represent, that it has "SAVED RESIDENTS MILLIONS OF DOLLARS."  This fraudulent and misleading

statement was published by Electricity Maine at RICO Defendants' direction using interstate wire communications.

j.  Since at least August 2016, Provider Power represented, and continues to represent, on its You Tube channel that "200,000 customers have switched to Electricity Maine, saving over $14 million in energy costs." This fraudulent and misleading statement was published by Electricity Maine at RICO Defendants' direction using interstate wire communications.

59.  These statements were fraudulent and deceptive because Electricity Maine, aggregately, has not saved customers money as it promised and represented; instead, Electricity Maine has increased its residential electricity customers' bills by at least $35 million. These statements, further, omit information regarding material risks, consequences, and other negative aspects of Electricity Maine's services.

60.  RICO Defendants, with intimate knowledge of the power industry, were aware of commodity markets' volatility at the time they caused Electricity Maine to publish the above statements and were aware that their promised power prices would not always be lower than the standard-offer rate.

61.  RICO Defendants were aware at the time that they caused Electricity Maine to make these representations that Electricity Maine could only succeed as a business and recoup the promotional costs of recruiting each customer by raising Electricity Maine's rates above the standard offer.

62.  RICO Defendants were aware at the time they caused Electricity Maine to make these representations that Electricity Maine could not possibly always beat the standard offer—or even beat the standard offer for any significant period of time. RICO Defendants deliberately misrepresented the price of Electricity Maine's residential electricity services as part of a scheme to deprive Plaintiffs and Class Members of their property.

63.     RICO Defendants were incentivized to misrepresent the price of Electricity Maine's services and omit from their advertising and marketing the true cost of their services because RICO Defendants' business model is entirely dependent on its ability to (1) promise unrealistic price savings and (2) automatically reenroll customers into new contracts at rates that allow them to make a profit.  Without engaging in fraudulent and misleading marketing and without the ability to deceptively reenroll customers—and reenroll them at higher rates when wholesale electricity prices are rising—Electricity Maine would quickly fail or, at a minimum, would not profit.  For this reason, RICO Defendants actively concealed and withheld, and caused others to conceal or withhold, accurate information regarding the actual cost of Electricity Maine's electricity supply services.

64.     Prior to December 9, 2014, Electricity Maine's "Terms and Conditions," explicitly stated that it would provide renewal notice by "Confirmation Letter" (*Exhibit B at 1*)—representing that its customers would receive a renewal notice by interstate mail before their electricity rates increased.  These "Terms and Conditions" were published on Electricity Maine's and Provider Power's websites continuously since at least April 18, 2014.

65.     On at least 200,000 occasions between 2012 and 2015, RICO Defendants were required by contract and regulation to use interstate mail to provide notice to Plaintiffs and Class Members that material changes in their terms of service with Electricity Maine were imminent.

66.     RICO Defendants' fraudulent promise of a "Confirmation Letter" constitutes mail fraud in violation of 18 U.S.C. § 1341.  RICO Defendants intentionally did not disclose material changes in Electricity Maine's customers' terms of service by U.S. mail; instead, renewal notices were sent using deceptive emails and interstate wires.  Because Plaintiffs and Class Members were expecting letters that informed them (1) that their Electricity Maine contracts would

automatically renew without action on their behalf and (2) of the terms of renewal, RICO Defendants' fraudulent representations caused Plaintiffs' and Class Members' auto-renewal at significantly increased electricity supply rates.

67.     RICO Defendants failed to disclose to the Maine Public Utilities Commission that Electricity Maine sometimes reenrolled customers at rates that greatly exceeded the standard offer; that Electricity Maine was contractually obligated to send renewal notices by letter; and that Electricity Maine did not provide renewal notices in or with customers' monthly bills.

68.     Defendants used interstate wires—through Electricity Maine's website or by telephone—to consummate their fraudulent scheme and enroll customers in their services.

## C.      Pattern of Racketeering

69.     RICO Defendants' repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, extend over a period of years from 2011 until the present, involve distinct and independent criminal acts and episodes, and constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

70.     The racketeering acts—wire and mail fraud—are described above in this Complaint.

71.     The racketeering acts are related and amount to, or pose a threat of, continued criminal activity because RICO Defendants, through the Enterprise, have conducted their fraudulent scheme since 2011.

72.     The racketeering acts are a regular way that the Enterprise conducts the RICO Defendants' ongoing illegitimate business.

73.     The racketeering acts are performed at the direction, or the ultimate direction, of RICO Defendants.

74. The racketeering acts share common methods of fraudulent and misleading advertising and omissions to defraud victims who purchase residential and small-business electricity supply services from Electricity Maine.

75. The acts committed against Plaintiffs were not isolated, but are related to those committed against nearly 200,000 Maine residential and small-business electricity supply customers.

76. The acts described continue today and are an imminent and daily threat to Maine residential and small-business electricity supply customers.

## C. Injury

77. Plaintiffs have been harmed by reason of RICO Defendants' fraudulent scheme because RICO Defendants' misconduct and predicate acts are both the but-for and proximate cause of Plaintiffs' and Class Members' injuries. This harm was not discoverable to Plaintiffs and Class Members until at least early 2013, when Electricity Maine began reenrolling its customers' into new, higher-rate, contracts, without notice, and Plaintiffs' and Class Members' monthly power bills began to increase.

78. Plaintiffs and Class Members, by reason of RICO Defendants' misconduct and predicate acts, purchased residential and small-business electricity supply services from Electricity Maine instead of from utility providers at the standard-offer rate.

79. Without RICO Defendants' misconduct, Plaintiffs and Class Members would not have purchased Electricity Maine's electricity supply services. Because electricity is a homogenous good that requires its purveyors to compete entirely on price, if RICO Defendants disclosed the true cost of their residential electricity services, Electricity Maine would have failed to enroll any appreciable number of customers. Instead, because of RICO Defendants'

fraudulent scheme, Electricity Maine enrolled almost 200,000 residential electricity customers and charged at least $35 million more than those customers would have paid for standard-offer service—the service that they would have received without RICO Defendants' fraud.

80.     WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against RICO Defendants; award Plaintiffs and Class Members three times their damages in an amount to be proven at trial, reasonable attorney fees, and costs; enjoin RICO Defendants from using the Enterprise to engage in illegal conduct; and grant Plaintiffs any other relief the Court deems just and proper.

## COUNT II
## VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT — 5 M.R.S. § 207

81.     Plaintiffs repeat and reallege the allegations in every previous paragraph of this Complaint as if fully set forth herein.

82.     Defendants engaged in, and continue to engage in, false, unfair, and deceptive business practices, advertising, and marketing in violation of 5 M.R.S. § 207.  These acts include but are not limited to:

      b.  Advertising and marketing that Electricity Maine's prices would always be lower than the standard offer;

      c.  Advertising and marketing Electricity Maine's prices as lower than the standard offer;

      d.  Failing to disclose the risks associated with Electricity Maine's product;

      e.  Auto renewing Plaintiffs' and Class Members' contracts without notice;

      f.  Advertising and marketing that Electricity Maine has saved customers millions of dollars;

      g.  Advertising and marketing that Electricity Maine will save customers millions of dollars in the future;

h.   Providing teaser rates that automatically increase without notice;

i.   Otherwise increasing Plaintiffs' and Class Members' electricity rates without notice; and

j.   Refusing to allow Electricity Maine customers to terminate auto-enrolled contracts.

83.   Defendants' business practices, advertising, and marketing, cause, or are likely to cause, substantial injury in that Plaintiffs and Class Members have suffered significant economic harm.

84.   Because of the extremely deceptive nature of the Defendants' conduct—including Defendants' failure to provide Plaintiffs and Class Members with renewal notices—this harm is not reasonably avoidable by Plaintiffs and Class Members.

85.   Defendants' fraudulent and misleading business practices provide little or no benefit to consumers.  Despite its increased price, Electricity Maine's electricity supply services, are identical to, and provides no additional benefit over, its competitors' services.

86.   On September 26, 2016, Plaintiff Katherine Veilleux, through counsel, demanded relief from Defendant Electricity Maine in writing pursuant to 5 M.R.S. § 213(1-A) (*Exhibit C*). Electricity Maine did not respond.

87.   WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against all Defendants and award Plaintiffs and Class Members actual damages in an amount to be proven at trial, reasonable attorney fees, costs, restitution, and injunctive relief prohibiting Defendants from (a) engaging in unfair and deceptive trade practices, (b) charging electricity rates greater than the standard-offer, and (c) charging early termination fees; and any other relief that the Court deems just and proper.

**COUNT III**
**NEGLIGENCE**

88.    Plaintiffs repeat and reallege the allegations in every previous paragraph of this Complaint as if fully set forth herein.

89.    Defendants owed Plaintiffs and Class Members a duty not to engage in fraudulent, misleading, or deceptive conduct, and not to misrepresent the cost of their services.

90.    Defendants breached that duty by engaging in the conduct alleged above in this Complaint.

91.    Defendants' negligent conduct proximately caused Plaintiffs and Class Members to incur significant economic harm in that Plaintiffs and Class Members have substantially overpaid for electricity supply services.

92.    WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against all Defendants and award Plaintiffs and Class Members actual damages in an amount to be proven at trial, reasonable attorney fees, costs, punitive damages, and any other relief that the Court deems just and proper.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**

93.    Plaintiffs repeat and reallege the allegations in every previous paragraph of this Complaint as if fully set forth herein.

94.    Defendants' misrepresentations were made in the course of Defendants' business and in transactions in which Defendants had a pecuniary interest.

95.    Defendants knowingly, recklessly, or negligently, misrepresented or failed to disclose information to Maine residential and small-business electricity supply consumers who

relied upon that false and misleading information in the course of their business and in consumer transactions.

96.     Defendants did not exercise reasonable care or competence in obtaining or communicating information.

97.     Plaintiffs and Class Members suffered pecuniary losses by justifiably relying on Defendants' misrepresentations.

98.     WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against all Defendants and award Plaintiffs and Class Members actual damages in an amount to be proven at trial, reasonable attorney fees, costs, punitive damages, and any other relief that the Court deems just and proper.

## COUNT V
## FRAUDULENT MISREPRESENTATION

99.     Plaintiffs repeat and reallege the allegations in every previous paragraph of this Complaint as if fully set forth herein.

100.     Defendants intentionally or recklessly misrepresented or failed to disclose material facts to Maine residential and small-business electricity supply consumers regarding the cost of Electricity Maine's electricity supply services.   Defendants' misrepresentations are described specifically in Count I.   The misrepresented facts are material because they caused consumers to purchase Electricity Maine's services.

101.     Defendants were aware of the falsity of their misrepresentations.   They were aware that it was economically impossible for Electricity Maine to beat the standard-offer electricity rate.

26

102.    Defendants misrepresented the cost of Electricity Maine's services for the purpose of enrolling residential and small-business electricity supply customers.

103.    Customers, in enrolling in Electricity Maine's services, reasonably relied on Defendants' misrepresentations and have suffered significant financial harm because of that reliance.

104.    WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against all Defendants and award Plaintiffs and Class Members actual damages in an amount to be proven at trial, reasonable attorney fees, costs, punitive damages; rescind Plaintiffs and Class Members contracts with Electricity Maine; and award any other relief that the Court deems just and proper.

**COUNT VI**
**ENJUST ENRICHMENT**

105.    Plaintiffs repeat and reallege the allegations in every previous paragraph of this Complaint as if fully set forth herein.

106.    As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from payments made by Plaintiffs and Class Members for residential electricity services at rates greater than standard-offer service.

107.    Defendants have voluntarily accepted and retained these payments, with full knowledge and awareness that, as a result of their wrongdoing, Plaintiffs and Class Members were overpaying for residential electricity services.

108.    By accepting payments for residential electricity services at rates greater than the standard-offer rate, Defendants are unjustly enriched.

109.    WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against all

Defendants and award restitution of Defendants' wrongful profits, revenues, and benefits  in an amount to be proven at trial and award any other relief that the Court deems just and proper.

## COUNT VII
## BREACH OF CONTRACT

110.    Plaintiffs repeat and reallege the allegations in every previous paragraph of this Complaint as if fully set forth herein.

111.    Defendants were contractually obligated to provide Plaintiffs and Class Members with a "Confirmation Letter" before they were automatically renewed in Defendants' residential electricity services.

112.    Defendants breached their contractual obligation to provide Plaintiffs and Class Members with a "Confirmation Letter" before renewal.   Despite this breach, Defendants reenrolled Plaintiffs and Class Members in Defendants' residential electricity services at significantly increased rates without notice.

113.    Plaintiffs and Class Members suffered significant economic loss as a result of Defendants' breach of contract.

114.    WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against Defendant Electricity Maine, LLC, and award compensatory and consequential damages in an amount to be proven at trial, reasonable attorney fees, costs, punitive damages, and any other relief that the Court deems just and proper.

## JURY DEMAND

115.    Plaintiffs demand a trial by jury on each and every count so triable.

Dated November 18, 2016, at Portland, Maine.

Respectfully submitted,

/s/ Thomas F. Hallett

_____

Thomas F. Hallett, ME Bar No. 3142

/s/ Timothy E. Zerillo

_____

Timothy E. Zerillo, ME Bar No. 9108

/s/ David A. Weyrens

_____

David A. Weyrens, ME Bar No. 4035

/s/ Benjamin N. Donahue

_____

Benjamin N. Donahue, ME Bar No. 5303
Attorneys for the Plaintiffs and Class Members
HALLETT, ZERILLO & WHIPPLE P.A.
75 Market Street
P.O. Box 7508
Portland, Maine 04112-7508
(207) 775-4255
bdonahue@hzwlaw.com

/s/ Robert P. Cummins

_____

Robert P. Cummins, ME Bar No. 5387
Attorney for Plaintiffs and Class Members
The Cummins Law Firm
33 North Dearborn Street
Chicago, Illinois 60602
312-662-6321
rpc@cumminlawfirm.com