| | |
|---|---|
| KATHERINE VEILLEUX and JENNIFER CHON, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )     Docket No. 1:16-cv-571-NT |
| | ) |
| ELECTRICITY MAINE, LLC, PROVIDER POWER, LLC, SPARK HOLDCO, LLC, KEVIN DEAN, and EMILE CLAVET, | ) ) ) ) |
| | ) |
| Defendants. | ) |

## ORDER ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFFS' MOTION TO AMEND

Before me are the Defendant's motion to dismiss and the Plaintiffs' motion for leave to file a second amended complaint ("**SAC**"). (ECF Nos. 30, 37.) The SAC asserts eight counts: Count One claims that Defendants Kevin Dean, Emile Clavet, and Spark HoldCo, LLC ("**Spark**") violated § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"). SAC ¶¶ 49-94 (ECF No. 37-1). Count Two alleges that Dean, Clavet, and Spark conspired to violate RICO § 1962(c) in violation of § 1962(d). SAC ¶¶ 95-103. Counts Three through Eight are brought against Dean, Clavet, and Spark, as well as Electricity Maine, LLC ("**Electricity Maine**"), and Provider Power, LLC ("**Provider Power**"). These counts include, respectively, a violation of the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207 ("**UTPA**"), SAC ¶¶ 104-10; negligence, SAC ¶¶ 111-15; negligent misrepresentation, SAC ¶¶ 116-21;

fraudulent misrepresentation, SAC ¶¶ 122-27; unjust enrichment, SAC ¶¶ 128-32; and breach of contract, SAC ¶¶ 133-37.

Spark moves to dismiss all eight counts against it. Spark argues that the alleged injurious conduct occurred before it became involved and that the Plaintiffs therefore fail to adequately plead injury caused by Spark's conduct. The Plaintiffs move for leave to amend to add allegations of conduct subsequent to Spark's involvement, including by joining a third named plaintiff. Spark resists the Plaintiffs' motion to amend on the grounds that even with the additional allegations, the SAC fails to state a plausible claim against Spark. For the following reasons, the Plaintiffs' motion for leave file a second amended complaint is **GRANTED** and the Defendant's motion to dismiss is **GRANTED IN PART and DENIED IN PART**.

## LEGAL STANDARD

A motion to dismiss a claim under Rule 12(b)(6) presents the question of whether the complaint sufficiently states a claim for which relief may be granted. *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 717 (1st Cir. 2014).

Generally, Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To make this determination, courts in the First Circuit follow a two-step analysis. First, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Carrero-Ojeda*, 755 F.3d at 717. Then, taking all well-plead facts as true and "drawing all reasonable inferences in [the plaintiffs'] favor," the court must determine whether

the complaint "plausibly narrate[s] a claim for relief." *Id.* "Plausible" means "more than merely possible" but does not require all facts necessary to establish a prima facie case. *Id.*

Beyond plausibility, Rule 9(b) requires "particularity" in pleading claims for which *"fraud lies at the core of the action." Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985). The particularity requirement means the complaint must state the "time, place, and content" of the fraud. *Id.* at 444. The defendant's intent or knowledge, however, may be alleged generally. Fed. R. Civ. P. 9(b).

Finally, Rule 15(a) provides that leave to amend a complaint should be "freely given when justice so requires." Fed. R. Civ. P. 15(a). Courts therefore generally grant leave to amend unless there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Forman v. Davis*, 371 U.S. 178, 182 (1962). The analysis for futility of amendment applies the same standard as that for a Rule 12(b)(6) motion to dismiss. *Morgan v. Town of Lexington*, 823 F.3d 737, 742 (1st Cir. 2016).

## FACTUAL ALLEGATIONS

At the motion to dismiss stage, I accept all of the Plaintiffs' well-pled allegations as true. Because the analysis for futility and a Rule 12(b)(6) motion to dismiss is the same, I grant the motion for leave file a second amended complaint and

proceed, with the parties' agreement, to consider the sufficiency of the allegations in the SAC.

The three named Plaintiffs in this dispute are the individuals Kathleen Veilleux and Jennifer Chon and the small business Rocky Coast. The Plaintiffs are customers of Defendant Electricity Maine, a competitive electricity provider ("**CEP**") in Maine, and they propose to represent a class of 100,000 like customers who enrolled in Electricity Maine before December 9, 2014. SAC ¶¶ 40-41. The individual defendants, Kevin Dean and Emile Clavet, founded Electricity Maine in 2011. SAC ¶¶ 8-9, 15. Dean and Clavet are also controlling members of Defendant Provider Power, LLC, a corporation that is separate from Electricity Maine but "operated as a cohesive unit under the name Electricity Maine until May 3, 2016."[1] SAC ¶ 6.

CEPs like Electricity Maine are private power supply companies that hedge electricity from wholesale providers and resell it to customers. SAC ¶ 25. CEPs are licensed under Maine law to compete with regulated utility providers. The Maine Public Utilities Commission ("**PUC**") sets a "standard offer" rate for electricity sold by regulated utility providers. SAC ¶¶ 13-14. Fluctuation in wholesale electricity prices may disadvantage CEPs when competing on price with utility providers. SAC ¶ 25.

Historically, CEPs stayed out of the residential and small business market because consumer interaction costs are high and because price is the primary basis

---

[1]     The SAC refers to Provider Power and Electricity Maine collectively as Electricity Maine, unless otherwise noted. SAC ¶ 6.

of competition between electricity providers. SAC ¶ 14. In 2011, CEPs in Maine held only 0.05% of the residential and small business supply market. SAC ¶ 15.

Between 2011 and 2013, however, Electricity Maine enrolled nearly 200,000 residential and small-business customers, approximately one-third of that consumer cohort in Maine. SAC ¶¶ 15-18. Electricity Maine advertised on radio, television, internet, and print that they offered substantial cost savings and low rates. SAC ¶¶ 16-18. The Plaintiffs provide several examples of this advertising, including:

- In August 2011, the *Lewiston Sun Journal* published Clavet's statement that Electricity Maine's rates "will always beat the standard offer. You'll never, ever pay more than the standard offer" and Electricity Maine's customer service project manager Danielle Beckwith's statement "there is no catch and no gimmicks . . . . [T]here's just a better rate." SAC ¶¶ 18(a)-(b); 66(a)-(b).

- Following the publication of Clavet and Beckwith's statements in the *Lewiston Sun Journal* article, Electricity Maine republished the fraudulent statements on their website. The fraudulent statements have remained published on Electricity Maine's website until at least December of 2016. SAC ¶ 66(c).

- In 2012, Clavet and Dean appeared on the television show 207TV and stated Electricity Maine prices were lower than the standard offer and that customers would be notified of any price increase. SAC ¶¶ 18(c); 66(d).

- In August of 2016, Provider Power stated on its website that it "SAVED RESIDENTS MILLIONS OF DOLLARS." SAC ¶¶ 18(i); 66(j).

- In November of 2016, Provider Power stated on its YouTube channel that "200,000 customers have switched to Electricity Maine, saving over $14 million in energy costs." SAC ¶¶ 18(j); 66(k).

When the Defendants advertised that they would always beat the standard offer, they knew that "recouping Electricity Maine's investment in customer recruitment was not possible without charging more than the standard offer." SAC ¶ 24; *see also* SAC ¶¶ 26, 68-69. Indeed, after enrolling 190,000 customers by mid-

2012, Electricity Maine began to significantly increase its rates in early 2013. SAC ¶ 22. Later, Electricity Maine rates were double the standard offer. SAC ¶ 22.

Electricity Maine included an automatic reenrollment provision as a term of service. SAC ¶ 29. Until January of 2015, the Maine PUC required CEPs to provide renewal notices between 30 and 60 days in advance of automatic renewal "in the customer's bill or in a separate document issued with the customer's bill." SAC ¶ 29. Electricity Maine also informed customers that it would send a "Confirmation Letter" before they were automatically reenrolled in another long-term contract under different terms. SAC ¶¶ 29, 72-74.

When customers' introductory terms expired, the Defendants did not send Confirmation Letters by mail on "at least 200,000 occasions between 2012 and 2015." SAC ¶¶ 30, 73. Instead, the "Defendants—if they sent any notice at all—provided notice by email." SAC ¶ 30. These email notices were not included in customers' bills or a document issued with the bill, in contravention of PUC regulations and customer expectations. SAC ¶ 30. Intending to confuse customers, the Defendants emailed the notices from "unrecognizable email addresses" and email addresses unaffiliated with Electricity Maine. SAC ¶¶ 31-32. The Defendants knew that renewal emails were going to customers' spam folders, and customers were not receiving notice. SAC ¶¶ 31, 34. The Defendants were also aware that customers could not understand the notices they did receive. SAC ¶ 32.

For example, on October 1, 2014, Electricity Maine sent Chon an email that her contract would be renewed for a 24-month term at a rate of $0.11394/kWh. SAC

¶ 33. In October of 2014, the standard-offer rate was approximately 43 percent lower than Electricity Maine's offered rate. SAC ¶ 34. This email went to Chon's spam folder, where she recovered it in 2016. SAC ¶ 34. Chon was reenrolled under the new terms without her knowledge. SAC ¶ 34.

On May 3, 2016, Provider Power sold all outstanding membership interest in Electricity Maine to Spark, a Delaware corporation with a principal place of business in Texas. SAC ¶ 7. The Plaintiffs allege the following with respect to Spark:

- Spark had "knowledge of the Enterprise's operations and the manner in which it automatically reenrolls customers without notice." SAC ¶ 63.

- Spark "seiz[ed] control of the Enterprise" from Clavet and Dean by purchasing Electricity Maine from Provider Power. SAC ¶ 61.

- Spark "shares control of Electricity Maine" with Clavet and Dean, each of whom "remains an Electricity Maine employee or consultant." SAC ¶¶ 8-9.

- Spark levied "significant financial incentives" with Provider Power "to control the Enterprise outside the corporate structure and enhance the fraudulent scheme previously controlled exclusively" by Clavet and Dean. SAC ¶ 61.

- Spark's "control over the Enterprise's racketeering activities through financial incentives is entirely distinct from its inherent corporate control over Electricity Maine's regular business activities." SAC ¶ 62. Spark "us[es] financial incentives to control the Enterprise outside the corporate parent-subsidiary relationship" between Spark and Electricity Maine. SAC ¶ 64.

- Spark's "use of informal control over the Enterprise permits Spark HoldCo to insulate itself from liability, avoid the constraints of legitimate corporate governance, and conceal its activity in Maine energy markets from state and federal regulators and consumers—all of which facilitate the fraudulent scheme." SAC ¶ 64.

- Spark "uses its control of the Enterprise to profit from, and to focus and enhance, the Enterprise's pattern of racketeering." SAC ¶ 64. Spark "directed and incentivized the Enterprise to intensify the fraudulent scheme." SAC ¶ 63.

- "Specifically," Spark provided Provider Power "with $2 million in working capital to acquire and retain customers and a $9 million incentive encouraging

the Enterprise to retain and enroll as many customers as possible through the below-described racketeering activities." SAC ¶ 63.

- Spark "urged the Enterprise, in May 2016, to increase its average customer kilowatt-per-hour-rate to over $0.10/kWh" when the standard offer rate was $0.06/kWh." SAC ¶ 63.

With respect to fraudulent actions committed by the Enterprise after Spark's purchase of Electricity Maine, the Plaintiffs allege that Rocky Coast "was renewed by Electricity Maine during summer 2016" at a rate exceeding the standard offer. SAC ¶ 35. This was "part of the reenrollment scheme directed by Spark." SAC ¶ 101. In addition, Veilleux received a renewal notice by email on June 28, 2017, offering a year of service at a rate exceeding the standard offer. SAC ¶ 35; Renewal Notice 1 (ECF No. 37-2).[2] The email was sent by renewals@electricityme.com, and the subject line was "Contract Renewal Notice – Electricity Maine." Renewal Notice 1.

The injury to the Plaintiffs and putative class members was the cost of remaining an Electricity Maine customer instead of returning to standard-offer service from a regulated electricity provider. SAC ¶ 100. Once enrolled, or reenrolled, customers must pay a $100 early termination fee. SAC ¶ 38. Absent the Defendants' conduct, "Plaintiffs and Class Members would have either left Electricity Maine for standard offer services or would have paid a lower rate for Electricity Maine services." SAC ¶ 102. Aggregated "through 2015," Electricity Maine increased customers' bills by $35 million. SAC ¶ 38.

---

[2] "When the factual allegations of a complaint revolve around a document whose authenticity is unchallenged, that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Young v. Lepone*, 305 F.3d 1, 11 (1st Cir. 2002) (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998)).

## PROCEDURAL HISTORY

The Plaintiffs brought this action on November 18, 2016, and filed a First Amended Complaint on December 20, 2016. On February 6, 2017, Spark brought a 12(b)(6) motion to dismiss, arguing that all the alleged fraudulent conduct occurred before its 2016 purchase of Electricity Maine and so the Plaintiffs could not establish proximate causation.

On July 7, 2017, the Plaintiffs filed a motion for leave to file a second amended complaint, seeking to provide allegations about the renewal of two Electricity Maine customers after the 2016 Spark purchase. Oral argument was held on September 11, 2017,[3] and I asked the parties to file simultaneous supplemental memoranda by September 25, 2017. Because the Defendant filed late, I offered the Plaintiffs a last opportunity to respond to any new arguments raised in the Defendant's Supplemental Memorandum by October 6, 2017.

## DISCUSSION

### I. Count One: RICO § 1962(c)

### A. The Law

In Count I, the Plaintiffs allege a substantive violation of RICO against Clavet, Dean, and Spark. 18 U.S.C. §§ 1962(c), 1964(c). Section 1962(c) makes it:

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

---

[3] The parties jointly requested oral argument. (ECF No. 36.) Days after the argument, Plaintiffs' counsel filed a letter asking the Court not to rely on the statements he made regarding mail and wire fraud. (ECF No. 43.) Counsel did not specify which statements he seeks to withdraw, and considering that the argument lasted over an hour, I am not going to guess. The request is, accordingly, denied.

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c). RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To establish an enterprise, a plaintiff "may prove either the existence of a legal entity, such as a corporation, *or* that a group of individuals were associated-in-fact." *Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1557 (1st Cir. 1994). Here, the Plaintiffs allege that the Enterprise comprises the limited liability corporations Electricity Maine and Provider Power. SAC ¶ 51.

A "pattern of racketeering activity" denotes at least two predicate acts within a ten-year period. § 1961(5). RICO's definition of "racketeering activity" includes a laundry list of qualifying predicate acts, including any act which is indictable under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud). 18 U.S.C. § 1961(1)(B). Mail and wire fraud are the predicate acts herein alleged. In pertinent part, the mail fraud statute provides criminal penalties for anyone who:

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . or knowingly causes to be delivered by mail or such carrier.

18 U.S.C. § 1341. In addition, a "plaintiff does not need to prove that each defendant personally used the mails but only that the defendant acted 'with knowledge that the use of the mails will follow in the ordinary course of business, or [acted in circumstances] where such use can be reasonably foreseen.' " *P & B Autobody*, 43 F.3d

at 1560 (quoting *United States v. Maze*, 414 U.S. 395, 399 (1974)). Similarly, the wire fraud statute makes it a crime to transmit or cause to be transmitted "by means of wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures, or sounds" for the purpose of executing any scheme to defraud. 18 U.S.C. § 1343.

RICO provides a private, civil cause of action to "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). To establish civil liability for violation of § 1962(c), a plaintiff therefore must prove not only the necessary elements of RICO and the predicate acts, but also an injury to business or property by reason of the defendant's conduct. To meet this standard, a plaintiff must show that defendant's violation "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461 (2006). A "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985).

Finally, because the Plaintiffs assert a substantive violation of RICO based on predicate acts involving fraud, Plaintiffs must state the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b); *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987).

**B.    Analysis**

The Plaintiffs claim that the Defendants enroll Electricity Maine customers through a two-part fraudulent scheme. In essence, the Plaintiffs allege that first the Defendants enroll customers in Electricity Maine through the false promise of price savings compared to the standard offer, and then they automatically renew customers at rates higher than the standard offer, without providing the notification that customers expect. SAC ¶¶ 72-73. The Plaintiffs allege that the Defendants deliberately failed to provide notice or provided defective notice in the following ways: (1) by sending renewal notices via email rather than a "Confirmation Letter" as explicitly promised, SAC ¶¶ 72-75; (2) by failing to include the renewal notice in or with the customer's bill between 30 and 60 days in advance of automatic renewal as required by Maine PUC regulations, SAC ¶¶ 29-30; and (3) by sending renewal emails from unrecognizable email addresses that went directly to customers' spam folders. SAC ¶¶ 31, 34.

Spark argues that all the alleged injurious conduct occurred before it purchased Electricity Maine and that the Plaintiffs therefore fail to assert a claim that Spark proximately caused their injuries. Def.'s Mot. to Dismiss 3. Spark supports this argument by citing to allegations that Electricity Maine (1) enrolled 200,000 customers "between 2011 and 2014," (2) auto-renewed customers "between Electricity Maine's inception in 2011 and December 9, 2014," and (3) caused customers to overpay for their electricity "through 2015." Def.'s Mot. to Dismiss 4. The Plaintiffs contend that Spark engaged in a pattern of fraudulent conduct that caused harm to them and to putative class members.

I start with the enrollment part of the alleged two-part scheme. Because the putative class includes only those customers who enrolled before December of 2014, and because Spark was unaffiliated with the Enterprise before May of 2016, Spark's conduct cannot be found to have caused the fraudulent enrollment of anyone in the class.[4] This narrows the issue to the reenrollment scheme.

The 138-paragraph SAC makes a number of broad allegations specific to Spark.[5] For example, the Plaintiffs allege that Spark controlled the Enterprise through financing and incentives paid to Provider Power. *See* SAC ¶¶ 61-64, 86. Spark gave Provider Power $2 million in working capital to acquire and retain customers and a $9 million incentive to retain and enroll as many customers as possible. SAC ¶¶ 63, 86. Spark "directed and incentivized the Enterprise to intensify the fraudulent scheme" and "urged the Enterprise" to raise customer rates. SAC ¶ 63. These general allegations do little to explain how Spark participated in the fraudulent scheme.

With regard to specific conduct that harmed the Plaintiffs after Spark's purchase of Electricity Maine, the SAC alleges that:

> Electricity Maine, as part of the reenrollment scheme directed by Spark HoldCo reenrolled Plaintiff Rocky Coast in late summer of 2016 at a rate substantially exceeding the standard offer. Plaintiff Veilleux, similarly,

---

[4] Despite language in the SAC referring to Spark's investment "outside corporate channels," the Plaintiffs make no claim of successor liability and expressly confirmed at oral argument that they are not seeking to pierce the corporate veil. Oral Arg. Tr. Sept. 11, 2017 49:24-50:3.

[5] The Plaintiffs frequently lump all the Defendants together in their allegations of mail and wire fraud without stating specifically which Defendant did what. For example, "Defendants' repeated violations of the federal mail and wire fraud statutes extend . . . from 2011 until the present." SAC ¶ 82. The "Defendants engaged in, and continue to engage in . . . . acts [that] include but are not limited to: [a]uto renewing Plaintiffs' and Class Members' contracts without notice." SAC ¶ 105(e). And the "Defendants continue to charge prices greatly exceeding the standard offer." SAC ¶ 38.

received an email on June 28, 2017, seeking to enroll her at $0.1099 /kWh—a rate almost double the current standard-offer rate.

SAC ¶ 101.[6] The Plaintiffs assert that Veilleux and Rocky Coast's reenrollments were similar to Chon's 2014 reenrollment. SAC ¶¶ 34-35. Plaintiffs allege that Chon was reenrolled without notice and that her renewal email was later recovered from her spam folder. SAC ¶ 34.

But the Plaintiffs' allegation that Spark kept up the previously existing fraudulent scheme breaks down when one examines the allegations pertaining to the Veilleux and Rocky Coast reenrollment. First, it is clear that Veilleux actually received notice from Electricity Maine. The allegation that Electricity Maine confused customers by sending renewal notices from "unrecognizable email addresses" and email addresses unaffiliated with Electricity Maine, is belied by the Veilleux renewal notice, which was sent from a recognizable, affiliated email address (@electricityme.com), with the subject line "Contract Renewal Notice – Electricity Maine," and which contained unambiguous language about how to terminate the contract. *See* SAC ¶¶ 31-32, Renewal Notice 1. There is no allegation that Rocky

---

[6]     The only other paragraph which describes conduct post-Spark's involvement essentially offers this same information:

> Similarly [to Plaintiff Chon's reenrollment], Plaintiffs Veilleux and Rock [sic] Coast, were, and continue to be, reenrolled at rates greatly exceeding the standard offer. And most recently, Plaintiff Veilleux, an Electricity Maine customer since 2012, received an email on June 28, 2017, offering her a year of service at $0.1099 /kWh—the current standard-offer rate is set at $0.06691/kWh.

SAC ¶ 35.

The SAC also alleges that until at least December of 2016, fraudulent statements that Electricity Maine afforded "no catch and no gimmicks," "there's just a better rate" remained on Electricity Maine's website. SAC ¶ 66(c); Pls.' Supp. Mem. 10. While this occurred after Spark's purchase, there is no perceptible link to the Plaintiffs' injuries.

Coast did not receive notice, nor are there any specific allegations which shed any light on whether Rocky Coast's notice was defective. These are the types of facts that would be within the purview of Rocky Coast, yet the SAC merely asserts that Rocky Coast was renewed in the summer of 2016 at rates higher than the standard offer. SAC ¶ 35.

Second, the SAC asserts that the regulation requiring renewal notices to be sent with a bill between 30-60 days ahead of the end of the contract was in effect until January of 2015. SAC ¶ 29. So, according to the allegations of the SAC, at the time Spark acquired Electricity Maine in May of 2016, it was no longer required to follow that regulation.

Finally, Plaintiffs are left with the allegation that Electricity Maine, under Spark's control, sent the renewal notices via email rather than United States mail.[7] The Plaintiffs allege that Electricity Maine "represent[ed] that its customers would receive a renewal notice by interstate mail before their electricity rates increased," SAC ¶ 72, and customers in fact expected the renewal notice to come via the mail. SAC ¶ 74. The Terms of Service attached to the First Amended Complaint do promise a "Confirmation Letter" that will provide notice about renewal, but the Terms of Service say nothing about how the letter would be sent or what it would look like.

---

[7]     When asked at oral argument to specify what was fraudulent about Veilleux's renewal, Plaintiffs' counsel pointed only to the fact that the notice came via email rather than United States mail. Oral Arg. Tr. Sept. 11, 2017 at 24:11-20, 30:21-31:16, 32:10-14.

Terms of Service (ECF No. 12-2).[8] Perhaps a tacit promise to use United States mail as opposed to email, when combined with an allegation that the email was deliberately disguised or designed to be diverted to a spam folder, might be sufficient to state a claim of mail fraud. Standing alone, however, the fact that the renewal notice came via email rather than United States mail when the Terms of Service were silent about the mode of delivery is insufficient to state a claim for relief.

The allegations that Spark engaged in a pattern of mail or wire fraud that caused Chon, Veilleux, and Rocky Coast harm do not meet Rule 9(b)'s heightened pleading standard and thus the SAC fails to state a RICO § 1962(c) claim against Spark. Count One will be dismissed against Spark.

## II.      Count Two: RICO § 1962(d)

### A.      The Law

The RICO conspiracy provision states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). In *Salinas v. United States*, the Supreme Court interpreted the RICO term "to conspire" in its conventional sense. 522 U.S. 52, 63 (1997). Holding that it was unnecessary for each defendant to have committed two predicate acts in a § 1962(d) conspiracy to violate § 1962(c), the *Salinas* Court explained:

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal

---

[8]      The Plaintiffs attached Electricity Maine's Terms of Service to its First Amended Complaint, and Plaintiffs' counsel asked that those terms be considered attached to their Second Amended Complaint. Oral Arg. Tr. Sept. 11, 2017 at 32:15-33:11.

endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public and so punishable in itself.

*Id.* at 65. To establish a civil RICO conspiracy, a plaintiff therefore must demonstrate that "(1) two or more people agreed to commit a subsection (c) offense, and (2) a defendant agreed to further that endeavor." *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012). "[I]t is not necessary for the conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities and persons involved." *P & B Autobody*, 43 F.3d at 1562.

In addition, to have a private cause of action, a plaintiff asserting a civil RICO conspiracy claim must show "injur[y] in his business or property by reason of a violation of Section 1962." 18 U.S.C. § 1964(c). Returning to the basic principles of civil conspiracy, Justice Thomas explained that at the time of RICO's enactment in 1970, "a plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious." *Beck v. Prupis*, 529 U.S. 494, 501 (2000). "Consistent with this principle, it was sometimes said that a conspiracy claim was not an independent cause of action but was only the mechanism for subjecting co-conspirators to liability when one of their member committed a tortious act." *Id.* at 503. Based on these principles, the Supreme Court concluded that "injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO is not sufficient to give rise to a cause of action under § 1964(c) for a violation of §

1962(d)." *Id.* at 505 (internal citation omitted). A conspirator does not have to be the one to commit the predicate acts or agree to be the one to commit the predicate acts, but no civil claim can lie unless the plaintiff has suffered injury to business or property "by reason of" a predicate violation of § 1962. *See RSM Prod. Corp.*, 682 F.3d at 1048.

## B.     Analysis

Spark's challenges to the RICO conspiracy count boil down to three arguments.[9] First, Spark contends that the Plaintiffs either lack standing or fail to state a claim for relief because they cannot show that their harm was proximately caused by any action taken by Spark. Second, Spark contends that the Plaintiffs have have expressly plead that the conspiracy began in May of 2016, and Spark cannot be liable for acts taken by others before the conspiracy existed. Finally, Spark argues

---

[9]     Spark's arguments for dismissal of the conspiracy count have evolved over the course of the pleadings. In its motion to dismiss, Spark contended that the Plaintiffs were unable to establish proximate causation for acts that occurred before they purchased Electricity Maine. In its Reply brief, Spark added two arguments: first, that the allegations in the First Amended Complaint, when stripped of legal conclusions, were insufficient to state a claim that Spark participated in any conspiracy, and second, that Spark was not liable for predicate acts occurring before it purchased Electricity Maine, because civil, as opposed to criminal, RICO conspiracy "only causes recoverable injury to business or property to the extent it is furthered by the commission of an overt act of racketeering that is substantively wrongful under RICO." Def.'s Reply 5-6 (ECF No. 34). Spark opposed the Plaintiffs' motion to amend on the grounds that the Second Amended Complaint was futile because it still failed to state a viable claim against Spark under Rule 9(b). Spark's Supplemental Memorandum asserted a standing argument supported by three sub-points: (1) that criminal RICO case law is not persuasive authority in the civil RICO context; (2) that civil RICO conspiracy does not extend to unforeseeable acts committed by a co-conspirator; and (3) that co-conspirators are not liable for predicate acts before the alleged conspiracy began. Def.'s Supp. Mem. 3-7 (ECF No. 46).

Because the Plaintiffs, by proposing a second amended complaint, have themselves been a moving target, and because I gave the last word to the Plaintiffs by allowing them to file a response to the Defendant's supplemental memorandum, I am considering all of the Defendant's arguments, even though I have the discretion to reject an argument that is raised late in the game.

that the SAC does not sufficiently plead that Spark participated in a conspiracy at all. I sidestep the first[10] and second[11] arguments because I agree with the third.

Spark claims that the Plaintiffs have not stated a plausible claim of Spark's agreement to enter the conspiracy. Def.'s Reply to Pls.' Opp'n to Def.'s Mot. to Dismiss 4-5 ("**Def.'s Reply**") (ECF No. 34). "Simply buying the company," Spark asserts, is

---

[10] The civil liability of a late-joining RICO conspirator for the predicate acts of co-conspirators that occurred before the late-joining co-conspirator arrived is a particularly difficult question that few courts have addressed. See *Grange Mut. Cas. Co. v. Mack*, 290 Fed. App'x 832, 835 (6th Cir. 2008) (remanding to the district court to determine whether the defendant could be held liable for injuries caused by the conspiracy prior to the defendant's joinder in the conspiracy). The question involves defining proximate cause and making complex distinctions between civil and criminal RICO conspiracy and between RICO civil conspiracy and common law civil conspiracy. Spark points me to *Mattel, Inc. v. MGA Entertainment, Inc.*, in which the trial judge determined that a late-joining conspirator could not be civilly liable under RICO for the predicate acts of co-conspirators that occurred before it joined the conspiracy. *See* No. CV 04-9049 DOC, 2010 WL 11463911, *3 (C.D. Cal. Sept. 9, 2010). The Plaintiffs cite authorities for the liability of late-joining conspirators. *See, e.g., United States v. Baines*, 812 F.2d 41, 42 (1st Cir. 1987) ("[a] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed."); *De Vires v. Brumback*, 349 P.2d 532, 535 (Cal. 1960) ("It is the settled rule that to render a person civilly liable for injuries resulting from a conspiracy . . . it is not necessary that he should have joined the conspiracy at the time of its inception; every one who enters into such a common design is in law a party to every act previously or subsequently done by any of the others in pursuance of it.").

[11] Pointing to the express allegations of the SAC that the conspiracy began when Spark, Clavet, and Dean entered into an agreement in May of 2016, Spark alleges that it cannot bear liability as a conspirator for acts that occurred before the conspiracy was formed. SAC ¶¶ 50, 96-97. See Def.'s Supp. Mem. 7-11. Spark relies on *Lopez v. Council on American-Islamic Relations Action Network, Inc.*, where a complaint was dismissed because the plaintiff failed to establish RICO conspiracy liability where the predicate acts occurred before the conspiracy formed. 657 F. Supp. 2d 104, 107 (D.D.C. 2009), *aff'd*, 383 Fed. App'x 1 (D.C. Cir. 2010). The plaintiff alleged that the Council on American-Islamic Relations (CAIR), covered up fraud committed by an employee, and in so doing, became a conspirator in the underlying fraudulent scheme. *Id.* But the underlying fraudulent scheme in *Lopez* involved only one person, and since conspiracy requires at least two people, the conspiracy alleged came into existence only when the cover up began. *Id.* at 113. The prior predicate acts committed by the employee, which caused the victims their losses, could not be attributed to CAIR through a conspiracy theory. *Id.* The Plaintiffs here distinguish *Lopez* on the ground that the fraud here was committed by both Clavet and Dean prior to Spark's agreement to join the conspiracy. While the Plaintiffs recognize that they did not expressly allege a pre-existing conspiracy, they argue that an agreement before May of 2016 can be inferred because "[i]mplicit in every well-pled 1962(c) allegation against two or more defendants is a violation of 1962(d)." Pls.' Opp'n to Def.'s Supp. Mem. 2 (citing cases) (ECF No. 48).

"not enough." Def.'s Reply 5. Plaintiffs counter that SAC paragraphs 97-103 sufficiently allege Spark's agreement.[12]

The assertion that Spark "entered into an agreement" with Clavet and Dean and "embraced Dean and Clavet's objective" is conclusory. *See* SAC ¶¶ 97-98. Additional factual allegations include that Spark "was aware of the essential nature and scope of the Enterprise's predicate acts" because of unspecified "due diligence" and "long-time participa[tion] in CEP operations." *See* SAC ¶ 99. The alleged manifestation of the agreement to violate § 1962(c) was that Spark gave Provider Power "$2 million in working capital to acquire and retain customers and a $9 million incentive . . . to retain and enroll as many customers as possible." SAC ¶ 63. The alleged purpose of this financing was "for Clavet and Dean to intensify the number of

---

[12]  The parties dispute whether RICO conspiracy claims are subject to the more demanding Rule 9(b) standard. Pls.' Supp. Mem. 5-6 (ECF No. 44); Def.'s Supp. Mem. 12-14. Many, but not all courts apply Rule 8(a) to assess the sufficiency of the pleadings of a § 1962(d) claim. *See RSM Prod. Corp.*, 682 F.3d at 1048; *The Knit With v. Knitting Fever, Inc.*, 625 Fed. App'x 27, 36 n.9 (3rd Cir. 2015); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990) ("Pleading a conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a)."); *Overton Corp. v. Case Equip. Co.*, No. 89-cv-164-P, 1991 WL 16170, at *2 (D. Me. Jan. 17, 1991) (Rule 9(b) does not apply to RICO conspiracy claim); *Gas Tech. Inst. v. Rehmat*, 2006 U.S. Dist. LEXIS 86044, at * 115-16 (N.D. Ill. Nov. 27, 2006) ("The Seventh Circuit has not required the pleading of claims under § 1962(d) with particularity."); *see also* 5B Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1251.1 (3d ed.); *but see Lachmund v. ADM Inv'r Servs., Inc.*, 191 F.3d 777, 785 (7th Cir. 1999) (dismissing a § 1962(d) count lacking "particular" factual allegations of an act of agreement, the roles of the co-conspirators, or the two predicate acts to which the conspirators agreed); *Aaes v. 4G Companies*, No. H-11-cv-975, 2012 WL 949040, at *9 (S.D. Tex. Mar. 20, 2012) (Rule 9(b) applies to § 1962(d) pleading); *Sterling Nat. Mortg., Co. v. Infinite Title Sols., LLC*, No. 10-22147, 2011 WL 1303225, at *5 (S.D. Fla. Mar. 4, 2011) (applying Rule 9(b) and finding no factual allegations of an agreement to violate RICO or to commit two predicate acts); *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1479 (D. Colo. 1995) (a § 1962(d) claim "must plead with particularity an agreement to a pattern of racketeering activity, and an agreement to the statutorily proscribed conduct"); *cf. United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009) (Rule 9(b) applies to a conspiracy claim under the False Claims Act); *Lu v. Deng*, No. 16-cv-7283-CASRAOX, 2017 WL 373438, at *5 (C.D. Cal. Jan. 23, 2017) (Rule 9(b) applies to claims for civil conspiracy to commit fraud). I need not resolve this question because I find that the pleadings do not satisfy the more lenient Rule 8(a) standard.

predicate acts," but the SAC does not support this assertion with factual allegations. *See* SAC ¶ 98. And although the Plaintiffs hint at a shady side-deal when they allege that the financial incentives were provided outside the corporate structure, SAC ¶¶ 61, 64, they neither explain how the structuring of the payments facilitated the fraud nor seek to pierce the corporate veil. *See supra*, n.4. Finally, the Plaintiffs' examples of Spark's predicate acts consist of Rocky Coast's renewal and Veilleux's renewal email. *See* SAC ¶ 101. As discussed in the prior section, the SAC does not allege that the Rocky Coast and Veilleux renewals suffered from the same alleged deficiencies as Chon's renewal. In fact, the email sent to Veilleux suggests that Electricity Maine reformed its practices under Spark.

Setting aside the conclusory allegations, the remaining allegations of the SAC do not support a reasonable inference that Spark agreed to join and further the conspiracy to defraud customers. *See RSM Prod. Corp.*, 682 F.3d at 1051-52. Because the Plaintiffs "have not nudged their claim[] across the line from conceivable to plausible," Count II is also dismissed as to Spark. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

## III.    Maine State Law Claims

The Plaintiffs concede and stipulate that their claims of negligence, negligent misrepresentation, fraudulent misrepresentation, and breach of contract (Counts Four, Five, Six, and Eight) are not adequately plead against Spark. Pls.' Supp. Mem. 15 (ECF No. 44). The remaining claims against Spark are violations of UTPA and unjust enrichment (Counts Three and Seven).

With regard to the UTPA claim, the Plaintiffs alleged that the renewal contracts were obtained through fraud and that the refusal to allow Electricity Maine customers to terminate auto-enrolled contracts without paying an early termination fee continued to cause them harm. *See* SAC ¶¶ 105(j)-06; 110. In addition, the Plaintiffs alleged that the Defendants were unjustly enriched by knowingly accepting payments for electricity services at rates that were inflated and wrongfully secured. *See* SAC ¶¶ 130-31.

Spark has not addressed the state law claims in any detail. It is well established that courts "deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument." *Diaz-Colon v. Fuentes-Agostini*, 786 F.3d 144, 149 (1st Cir. 2015) (quoting *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir.2011)); *see also See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed.").

Here, Spark relegated its discussion of the state law claims to a footnote that simply states there is a requirement of proximate causation for each claim.[13] *See* Def.'s Mot. to Dismiss 3 n.3. This is an extension of Spark's overall argument that all alleged misconduct occurred before its May 2016 buyout. Spark has not addressed whether enforcement of the renewal contracts *after* May 2016 violates UTPA or the unjust enrichment doctrine, as the Plaintiffs allege. *See* 5B Charles A. Wright &

---

[13]     The Plaintiffs question whether a showing of proximate causation is required to make out a claim under UTPA and unjust enrichment. Pls.' Supp. Mem. 15.

Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1357 (3d ed.) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists."); *see, e.g., Lebron v. Ashford Presbyterian Cmty. Hosp.*, 995 F. Supp. 241, 243 (D.P.R. 1998); *Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.*, 778 F. Supp. 101, 103-04 (D.R.I. 1991). Counts Three and Seven will therefore survive the motion to dismiss. Counts Four, Five, Six, and Eight will be dismissed.

## CONCLUSION

For the reasons stated above, the I **GRANT** the Plaintiffs' motion for leave file a second amended complaint and **GRANT IN PART and DENY IN PART** the Defendant's motion to dismiss.

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 15th day of November, 2017.