# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| KATHERINE VEILLEUX, | ) | |
| JENNIFER CHON, ROCKY COAST | ) | |
| FAMILY ACUPUNCTURE, P.A., | ) | |
| and JAMES TILTON, individually and | ) | |
| on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | Civil Action No. 1:16-cv-571-NT |
| | ) | |
| ELECTRICITY MAINE, LLC, | ) | |
| PROVIDER POWER, LLC, | ) | |
| SPARK HOLDCO, LLC, | ) | |
| KEVIN DEAN, and EMILE CLAVET, | ) | |
| | ) | |
| Defendants | ) | |

## THIRD AMENDED CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND
## (INJUNCTIVE RELIEF REQUESTED)

NOW COME the Plaintiffs, Katherine Veilleux, Jennifer Chon, Rocky Coast Family Acupuncture, P.A., and James Tilton, individually and on behalf of all others similarly situated, and allege the following as their Third Amended Complaint against Defendants Electricity Maine, LLC, Provider Power, LLC, Spark HoldCo, LLC, Kevin Dean, and Emile Clavet:

## INTRODUCTION

1.     Defendant Electricity Maine, LLC, is a competitive electricity supplier.  Since 2011, Defendants have used Electricity Maine to overcharge Maine consumers for electricity supply services through fraudulent bait-and-switch and door-to-door sales schemes.

1

2.      In February 2018, the Maine Public Utilities Commission released a report calculating Defendants' overcharges at $58 million.

3.      This civil action seeks to remedy the significant financial harm caused by Defendants' fraudulent, deceptive, and unfair business practices.

**PARTIES**

4.      Plaintiff Kathleen Veilleux resides in Farmingdale, Maine.

5.      Plaintiff Jennifer Chon resides in Scarborough, Maine.

6.      Plaintiff Rocky Coast Family Acupuncture, P.A. is a Maine professional corporation with a place of business is South Portland, Maine.

7.      Plaintiff James Tilton resides in Bath, Maine.

8.      Defendant Electricity Maine, LLC, is a Maine limited liability company with a place of business in Auburn, Maine.  Until May 3, 2016, Electricity Maine, LLC, was wholly owned by Defendant Provider Power, LLC.

9.      Defendant Provider Power, LLC, is a Maine limited liability company with a place of business in Auburn, Maine.  Although Provider Power, LLC, and Electricity Maine, LLC, are separate corporate entities, they operated as a cohesive unit under the name Electricity Maine until May 3, 2016.  Throughout this Complaint, Defendants Electricity Maine, LLC, and Provider Power, LLC, are collectively referred to as Electricity Maine unless otherwise noted.

10.     Defendant Spark Holdco, LLC ("Spark") is a Delaware limited liability company with a principal place of business in Houston, Texas.  Spark operates electricity supply companies

2

in at least five other states.  On May 3, 2016, Spark purchased all outstanding membership interests in Electricity Maine, LLC, from Provider Power, LLC.

11.     Defendant Kevin Dean is an individual residing in Maine.  Kevin Dean is a controlling member of Provider Power, LLC.  Following Electricity Maine's sale to Spark on May 3, 2016, Kevin Dean, who remains an Electricity Maine employee or consultant, shares control of Electricity Maine with Emile Clavet and Spark.

12.     Defendant Emile Clavet is an individual residing in Maine.  Emile Clavet is a controlling member of Provider Power, LLC.  Following the sale of Electricity Maine, LLC, to Spark HoldCo on May 3, 2016, Emile Clavet, who remains an Electricity Maine employee or consultant, shares control of Electricity Maine with Kevin Dean and Spark.

## JURISDICTION AND VENUE

13.     This Court has federal-question jurisdiction over Plaintiffs' and Class Members' claims made pursuant to 18 U.S.C. § 1961 et seq.  Because the Plaintiffs' state law claims arise out of the same case or controversy, the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(1).

14.     Because all Defendants except Spark, are residents of Maine and because a substantial portion of the events and omissions giving rise to Plaintiffs' and Class Members' claims occurred within the State of Maine, venue is appropriate in the United States District Court, District of Maine.

**GENERAL ALLEGATIONS**

15.     Prior to 2000, regulated utilities dominated Maine's electric power industry and enjoyed a complete vertical monopoly in the generation, transmission, and supply of electricity to Maine consumers and businesses.

16.     In 2000, the Legislature, in enacting the Restructuring Act, 35-A M.R.S. § 3201 et seq., transformed the industry to permit private non-regulated firms to compete with utility providers in the electricity supply market.  Under the Restructuring Act, utility suppliers continue to supply electricity to Maine consumers and businesses on terms known as standard-offer service. Standard-offer service guarantees that all Maine ratepayers can receive electricity service at a fair rate that is approved by the Maine Public Utilities Commission.[1]   At the same time, The Restructuring Act permits competitive electricity providers ("CEPs") to enter the market and supply power in competition with the utility-providers.

17.     Following the enactment of 35-A M.R.S. § 3201, CEPs initially marketed their services only to industrial and commercial customers.  Businesses with significant electricity costs used the CEP market to hedge and negotiate fixed rates, resulting in more predictable long-term costs.  The residential and small-business electricity market, however, was widely seen by CEPs as unprofitable—the margins too thin and the cost of transacting with each consumer too high. Entering the market, moreover, proved difficult.   Electricity is a homogeneous good that consumers purchase for only one reason—price.  Without the ability to significantly undercut

---

[1]  Standard-offer service is provided through two regulated utilities: Central Maine Power services southern and western Maine and Emera Maine, formerly Bangor Hydro, services Northern and Eastern Maine.

utility-providers, whose standard-offer power supply services are set by the Maine Public Utilities Commission, CEPs struggled to gain market share in the residential and small-business electricity supply market.

18. Despite the economic challenges facing CEPs in the residential and small-business electricity-supply market, Auburn-based Electricity Maine, led by its founders Emile Clavet and Kevin Dean, entered the market in 2011 with remarkable success. In 2011, for example, CEPs held only a sliver of the residential supply market—0.05% of all Maine residential and small-business customers. Less than two years later, however, Electricity Maine alone had converted almost 160,000 customers to its services.

19. Defendants credited Electricity Maine's success to innovative marketing and a unique business model. They touted Electricity Maine's ability to compete on price, promising to beat the utility providers' standard-offer price under any circumstances and describing Electricity Maine's business as simple and straightforward—representing to potential customers that "there is no catch, no gimmicks" and that its promised low rates were not "too good to be true."

20. As a business, however, Electricity Maine succeeded only because of fraud and deception. And once Electricity Maine failed to deliver on its promise to "always beat the standard-offer," the obvious flaws in its operations were exposed. Not only was Electricity Maine's product "too good to be true"—contrary to its representations—but its remarkable success was possible only through a fraudulent bait-and-switch scheme that has two components. First, Electricity Maine enrolls customers through the false and misleading promise of price savings compared to the utilities' standard-offer rate. Second, after enrolling residential electricity

customers at artificially low promotional rates, Electricity Maine transfers customers, with little or no notice, to significantly higher long-term rates that greatly exceed the standard-offer rate—and from which customers cannot escape without paying a $100 early-termination fee.

21.     Electricity Maine's failure to deliver any real cost savings did not stop it from acquiring more customers or continuing to charge exorbitant rates.

22.     In 2013, after the Maine Public Utilities Commission questioned the accuracy of its advertisements comparing its prices to the standard offer, Electricity Maine merely sought different ways to acquire—and then overcharge—new customers.

23.     First, Electricity Maine partnered with charities and non-profits—like the Dempsey Foundation—using the tag line "the Power to Help."  Between 2014 and 2016, Electricity Maine spent hundreds of thousands of dollars on charity-based promotion.

24.     Later, it turned to a more old-fashioned fraud: soliciting new customers with door-to-door salesman dressed in Central Maine Power uniforms and badges, promising a $50 refund because of Central Maine Power overcharges.  When unsuspecting consumers provide their Central Maine Power bills and account numbers, Electricity Maine's door-to-door operatives enroll the unsuspecting ratepayers without their knowledge and at rates that greatly exceed the standard offer.

25.     Regardless of how Electricity Maine acquires its customers, they are all treated the same once enrolled—their rates are increased dramatically.

26.     In 2018, the Maine Public Utilities Commission released a report finding that competitive electricity providers cost Mainers approximately $77 million more than had those

6

consumers remained with standard-offer service. Electricity Maine—by far the largest competitive electricity supplier—accounted for $58 million of those overcharges and had the highest, or second highest, average rates of any competitive electricity supplier operating in Maine. (Ex. A).

## A.   Fraudulent and Misleading Promotion on Price During Between 2011 and March 2013

27.   Over a less-than-two-year period—from mid-2011 through March 2013—Defendants, through radio, television, internet, print, and other forms of advertising and marketing, managed to capture nearly one-third of the Maine residential and small-business electricity supply market by representing that Electricity Maine's services offered consumers significant price savings compared to the standard-offer and encouraging consumers to abandon their utility-provided electricity supply services.

28.   Defendants' marketing materials were created by Electricity Maine and then distributed to media outlets all over the state. Marketing materials where distributed as uniform talking points read by disc jockeys on different radio stations; pre-recorded audio and video clips; and form mailings published in newspapers and magazines.

29.   Regardless of form, the message of these advertising materials bore a nearly-identical message—Electricity Maine will save money on your electricity bill compared to the standard-offer utility rate.

30.   Lured to its website on the promise of bargain electricity prices, customers enrolled in Electricity Maine's services by entering personal and utility-provider information in a simple interactive form that contains no warnings, disclosures, or notices. To sign up, there is no

7

component that actively requires consumers to agree or consent to a set of terms and conditions—after entering the required information, soon-to-be Electricity Maine customers merely click "SUBMIT FORM."

31.    The combination of fraudulent and misleading marketing and promotion, and artificially low promotional rates, allowed Electricity Maine to rapidly gain significant market share in the Maine residential and small-business electricity supply market.  These marketing practices were so effective that, in 2012, Electricity Maine became the fastest growing energy company in the country.

32.    By early 2013, Electricity Maine had enrolled over 160,000 residential and small-business electricity customers.

33.    Based on Defendants' misrepresentations, Plaintiffs Jennifer Chon and Katherine Veilleux enrolled in Electricity Maine's electricity supply services between early 2012 and March 1, 2013.

34.    Electricity Maine's promise of always beating the standard offer proved short lived, however.  After reaching a peak customer count in 2013 of 160,000, Defendants used their large market share to reap enormous profits while providing Maine consumers with no benefit over utility-provided electricity supply services.  These prices greatly exceeded, and later almost doubled, the standard-offer rate. In March 2013, the Maine Public Utilities Commission ("PUC") began investigating Electricity Maine's advertising practices—specifically, Electricity Maine's marketing campaign comparing its prices to the standard offer.  To appease the PUC, Electricity Maine ceased all advertising that compared its product to standard offer pricing on March 8, 2013.

8

35.     With its only effective promotional message—saving money in comparison to the standard offer—under scrutiny by the PUC, Electricity Maine could no longer advertise effectively and customer enrollment dropped drastically.

**A.     Post-March-2013 advertising**

36.     Unable to advertise on price because of PUC oversight, Defendants attempted to lure consumers to its services by branding Electricity Maine as a local company that invested in the community and area non-profit organizations.   In a rebranding effort, Electricity Maine replaced its "Power to Save" slogan with the "Power to Help."

37.     Instead of spending millions on media advertising, Electricity Maine focused on partnering with local chambers of commerce, non-profits, and community groups.   Advertising itself as Maine's most "trusted" electricity provider, Defendants appeared at local community events; and Defendants Clavet and Dean were honored guests at local charity functions.

38.     Although Defendants managed to lure some customers to Electricity Maine with this advertising campaign, it proved remarkably ineffective in comparison the Electricity Maine's earlier advertising on price.

39.     The "Help" campaign continued until Spark's May 2016 acquisition of Electricity Maine.

40.     Despite Electricity Maine's promises of trust, protection of the vulnerable, transparency, dedication to the community, Electricity Maine treated these customers exactly like those enrolled during the period when it advertised on price.

B.     **Door-to-Door Fraud**

41.     Upon Spark's acquisition, Electricity Maine's marketing strategy took a new tack. Instead of using mass media to falsely guarantee saving in comparison to the standard offer, or enrolling customers by promising donations to organizations like the Dempsey Foundation, Electricity Maine—at Spark's direction—adopted a fraudulent door-to-door sales strategy that Spark uses in other states to enroll new customers.

42.     Spark's new marketing strategy makes no attempt at legitimacy; instead, Spark, upon acquiring Electricity Maine, recruited an army of door-to-door sales agents from its operations elsewhere in the country to travel door to door in Maine's low-income communities and elderly housing developments, impersonating utility workers to enroll new Electricity Maine customers.

43.     These Spark agents sport Central Maine Power badges and go so far as to wear Central Maine Power uniforms.  Typically, they approach a home or apartment and explain that they represent Central Maine Power.  The Spark agent then explains that he or she is an auditor from CMP, the homeowner has been overcharged, and then asks to see the homeowner's CMP bill.

44.     With the CMP bill, the "auditor" places a phone call to a third-party call center—explaining to the homeowner that the call is to confirm the CMP overcharges.  The "auditor" then reads the homeowner's CMP account number to the call center; places the homeowner on the line briefly on the false premise that he or she needs to confirm the CMP overcharges; and instructs the homeowner to respond yes to the operator's questions.

10

45.     After receiving an affirmative answer, the call center enrolls the unsuspecting customer with Electricity Maine.  Unlike Defendants' prior marketing schemes, however, the door-to-door victims do not enjoy a teaser rate for any period of time before reenrollment.  Instead, these individuals—who are expecting a refund check from CMP—are immediately enrolled a rate that greatly exceeds the standard offer.

46.     In this exact fashion, a man purporting to represent CMP approached Plaintiff Tilton's house on November 26, 2017.  The Spark agent purporting to represent CMP informed Mr. Tilton that, "due to a malfunction," CMP had overcharged him.  The Spark agent asked for Mr. Tilton's account information; made a call on his phone; and then instructed Mr. Tilton to confirm the change to his CMP account—which he did.

47.     Unbeknownst to Mr. Tilton, Spark's agent on that call, enrolled him with Electricity Maine at a rate that exceeded the standard offer by thirty percent.

48.     Upon information and belief, Spark's agents have been enrolling customers using the same or similar fraudulent routine since January 2017, shortly after Spark took control of Electricity Maine.

49.     Through various related parent companies and subsidiaries, Spark operates similar fraudulent enrollment schemes around the country.   Currently, Spark-related entities—all controlled by Spark's parent company, Spark Energy, Inc.—face allegations of fraudulent or deceptive business practices in at least five other proposed class action proceedings in Connecticut,

Pennsylvania, New Jersey, Illinois, New York, and California[2]; and investigations by the New York Public Service Commission and the Massachusetts Attorney General.

50.     Sparks' Maine door-to-door agents are employed, paid by, and controlled entirely by Spark from its offices in Houston.  These agents operate all over the state and target low income communities and the elderly.

51.     Defendants' door-to-door fraud has resulted in numerous complaints to CMP and law enforcement.  A report from the Norway Police Department is attached as (Ex. B).

52.     Spark uses Electricity Maine to intentionally facilitate its fraud, to deceive Plaintiff and Class Members, and to protect itself from liability should Plaintiffs and Class Members become judgment creditors as a result of this proceeding.  Because of these actions, Plaintiffs respectfully request that the Court pierce Electricity Maine's corporate veil and hold Spark jointly and severally liable for any judgment entered against Electricity Maine.

## C.     Reenrollment Scheme

53.     Regardless of how Plaintiffs and Class Members were enrolled in Electricity Maines services, they are all reenrolled through the same automatic process.

54.     The reenrollment process is the "switch" stage of Defendants' "bait and switch" scheme that allows Defendants to profit after acquiring large number of customers at teaser rates.

---

[2]  *See Mercado v. Verde Energy USA Inc.*, No. 1:18-cv-2068 (N.D. Ill. filed Mar. 21, 2018); *Horowitz v. Nat'l Gas & Elec., LLC. et al*, No. 1:17-cv-07742-JPO (S.D.N.Y. filed Oct. 10, 2017); *Gillis et al v. Major Energy, LLC. et al*, No. 2:14-cv-03856-MSG (E.D. Pa. filed Sept. 15, 2016); *Melville v. Spark Energy, Inc. et al*, No. 1:15-cv-08706-RBK-JS (D.N.J. filed Dec. 17, 2015); *Ortiz et al v. Spark Energy Gas, LLC.*, No. 4:15-cv-02326-JSW (N.D. Cal. filed May 22, 2015); *Roberts v. Verde Energy USA, Inc.*, No. 3:15-cv-00312-VLB (D. Conn. filed March 3, 2015).

55.     Using standardized form renewal emails and letters and an automated process, Defendants renewed Electricity Maine customers in batches that would sometimes exceed 60,000 customers.

56.     Defendants were acutely aware that disclosing accurate pricing would result in massive customer attrition and took great pains—and violated PUC regulations—to hide these price increases from customers.

57.     Using deceptive and fraudulent methods to hide prices increases, Electricity Maine used the reenrollment process to transition its customer base—over 160,000 in 2013—from electricity supply rates at or near the standard offer to exorbitant rates over forty-percent higher than the standard offer.

58.     From August 7, 2013 until January 26, 2015, Electricity Maine entered into an agreement with the PUC—because of its prior marketing practices—that required its renewal notices to compare customers' current prices to reenrollment prices.  Such a comparison would inform customers of the dramatic increase in their electricity bill should they do nothing and accept Electricity Maine's renewal price.

59.     Defendants breached their agreement with the PUC requiring them to disclose current and renewal prices. Instead of the pricing information required by the PUC, moreover, Defendants referred to the new renewal rate—which in some cases almost doubled the standard offer—as "competitive" and there to "protect" the customer against rising prices.

60.     Additionally, until January 26, 2015, Maine Public Utilities Commission regulations required that CEPs provide renewal notices between 30 and 60 days in advance of

automatic renewal "in the customer's bill or in a separate document issued with the customer's bill."

61.     Defendants used email tracking software that allowed them to tell how many renewal notices were rejected or remained unread.  Using this software, Defendants were aware that only fifty percent of Electricity Maine's customers saw their email renewal notices.

62.     Aware that many of its customers do not ever see renewal notices; and that most customers who see the notices are unlikely to take any action because the notices intentionally shrouded prices increase, Defendants comfortably renew most of their customer base at rates that greatly exceed the standard offer.  Electricity Maine customers who catch on to the scam and call to complain—referred to Defendants as "price sensitive customers"—are given another teaser rate to avoid losing market share and in hopes that the complaining customer will miss the next renewal notice.

63.     Defendants were so effective at concealing price increases that in 2014 and 2015— when Electricity Maine increased customers' rates to almost $.11/kWh from a standard-offer price near $.06/kWh—that they managed to retain almost all existing customers.

64.     In 2014 and 2015, for example, Electricity Maine targeted a renewal rate of $0.11394 /kWh and average price charged to customers almost approached that threshold— $0.1070 /kWh.  The standard offer rate during 2015 averaged $0.0671/kWh.  By the PUC's report issued in February 2018, Electricity Maine overcharged its customers by over $30 million in 2015 alone.

14

65.     On October 1, 2014, Electricity Maine sent Plaintiff Jennifer Chon an email stating that her contract would be renewed.  The email stated: "To protect you from rising rates, we have secured a competitive, 24-month fixed contract for you at $0.11394 /kWh, ending on your meter date in December, 2016.  There is no action required on your part."

66.     Electricity Maine's October 1, 2014, email never appeared in Plaintiff Chon's inbox.  She recovered it from her spam folder in 2016.  Electricity Maine was aware, and informed Plaintiff Chon, that its auto renewal notices consistently went directly to customers' spam folders.  The standard-offer rate at the time was approximately $0.076 /kWh or forty-three-percent lower than Electricity Maine's "competitive" rate, at which Plaintiff Chon was reenrolled in without her knowledge.

67.     Similarly, Plaintiffs Veilleux and Rock Coast, were, and continue to be, reenrolled at rates greatly exceeding the standard offer.  Plaintiff Rocky Coast was renewed by Electricity Maine during summer 2016.  And most recently, Plaintiff Veilleux, an Electricity Maine customer since 2012, received an email on June 28, 2017, offering her a year of service at $0.1099 /kWh— the current standard-offer rate is set at $0.06691 /kWh.

68.     By auto renewing customers at significantly higher prices, Defendants are able to (1) sustain Electricity Maine's business and recoup its promotional investment in customer acquisition, (2) maintain sufficient aggregate value from Electricity Maine's outstanding customer contracts to provide collateral to wholesale electricity providers—who lend wholesale electricity to Electricity Maine using its customers' contractual obligations as security—and (3) to reap significant profits by gouging unsuspecting customers.

69.     Because retail electricity is such a homogeneous good that requires competitors to compete on price, a reenrollment system that actually informed customers that their new electricity supply rate would substantially exceed competitors' pricing—that is, the standard offer—would have put Electricity Maine out of business in 2013.  Electricity Maine's continued operation is only feasible through deception and fraud.

70.     As customers saw their bills skyrocket, Electricity Maine's growth faltered.  But the damage had already been done.  With at least twenty-percent of Maine's residential and small business electricity consumers as current customers—who cannot escape without paying a $100 termination fee—Defendants continue to charge prices greatly exceeding the standard offer.  And instead of saving Mainers money, Electricity Maine, through 2016, has increased its customers' electricity bills aggregately by at least $58 million.  (Ex. A).

## CLASS ACTION ALLEGATIONS

71.     Plaintiffs bring this action as a class action on behalf of themselves and all other persons and entities similarly situated ("Class" or "Class Members").

72.     The Class includes:

All Electricity Maine residential and small-business customers who switched from standard-offer service to Electricity Maine's electricity supply services at any point in time until a judgment in this matter.

Excluded from the Class are: (1) Defendants, their employees, officers, directors, assigns, successors, and any entity in which they have a controlling interest; (2) the United States District Court Judge to whom this case is assigned and any member of that Judge's immediate family; (3) the United States Magistrate Judge to whom this case is assigned and any member of that Magistrate Judge's immediate family; (4) the Plaintiffs' and Class Members' law firms, Hallett, Whipple & Weyrens, P.A., and The Cummins Law Firm, P.A., and their attorneys, staff, and any

members of those attorneys' and staff members' immediate families; (5) all claims for personal injury, wrongful death, or any incidental damages.

73.     The Class includes three distinct subclasses:

The "Price Subclass" which includes:

All Electricity Maine residential and small-business customers who switched from standard-offer service to Electricity Maine's electricity supply services before February 28, 2013.

The "Help Subclass" which includes:

All Electricity Maine residential and small-business customers who switched from standard-offer service to Electricity Maine's electricity supply services between March 1, 2013 and January 13, 2017.

The "Door-to-Door Subclass" which includes:

All Electricity Maine customers who switched from standard-offer service to Electricity Maine's electricity supply services from January 14, 2017, until a final judgment in this matter.

74.     The Class is comprised of over 160,000 residential electricity customers making joinder impractical. The disposition of Class Members' claims in a single class action will provide substantial benefits to all parties and to the Court.

75.     There are numerous questions of law and fact common to the Plaintiffs and the Class, including:

        a.   Whether Defendants are engaged in trade or commerce;

        b.   Whether Defendants' advertising and business practices are fraudulent, misleading, unfair, or deceptive;

        c.   Whether Defendants falsely represented, failed to disclose, or concealed, the cost of Electricity Maine's services;

        d.   Whether Defendants withheld material information from consumers;

17

e.   Whether Defendants' misconduct provides any benefit to consumers;

f.   Whether Defendants' misconduct is reasonably avoidable by consumers;

g.   Whether Defendants' conduct caused, likely caused, or could reasonably be found to have caused, substantial injury to consumers;

h.   Whether RICO Defendants, through the conduct of an enterprise, engaged in a pattern of racketeering by repeatedly engaging in mail and wire fraud;

i.   Whether RICO Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d);

j.   Whether Electricity Maine and Provider Power constitute an enterprise within the meaning of 18 U.S.C. § 1961(4);

k.   Whether RICO Defendants committed mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343 by using interstate mail and wires to execute and further their fraudulent scheme;

l.   Whether RICO Defendants' misconduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5);

m.   Whether RICO Defendants' violations of 18 U.S.C. § 1961 et seq. caused Plaintiffs and Class Members to suffer economic harm;

n.   Whether Defendants profited and benefited from Plaintiffs' and Class Members' payments for residential electricity services;

o.   Whether Defendants voluntarily accepted and retained Plaintiffs' and Class Members' payments;

p.   Whether Defendants were unjustly enriched by accepting Plaintiffs' and Class Members' payments;

q.   Whether Defendants' should make full restitution to Plaintiffs and all Class Members.

r.   Whether Defendants' affirmative defenses bar Plaintiffs' and Class Members claims.

18

76.     These common questions of law and fact predominate over any questions affecting only individual Class Members.  The factual basis of Defendants' misconduct is common to all Class Members and represents a universal thread of deceptive, fraudulent, and unfair practices that resulted in a common injury to all Class Members, making class adjudication superior to any other available method of resolution.

77.     Without class certification, prosecution of separate actions by individual members of the Class—who have not, to Plaintiffs' knowledge, commenced any litigation against Defendants—would be prohibitively expensive and would create the risk of inconsistent or varying adjudications with respect to individual members of the Class.  Because of the cost of bringing individual actions, Class Members will, absent certification, continue to incur damages and Defendants' misconduct will continue unmitigated.

78.     Similarly, the Plaintiffs' claims are typical of the claims of the Class, and common questions of law and fact predominate, because the Plaintiffs, like all Class Members:

    a.  Were exposed to the same unfair, deceptive, fraudulent and misleading conduct and business practices;

    b.  Purchased Electricity Maine's services because of Defendants' misconduct;

    c.  Were automatically reenrolled in Electricity Maine's services because of Defendants' misconduct;

    d.   Have been damaged by Defendants' misconduct; and

    e.  Seek redress under the same legal theories.

79.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained experienced counsel who are committed to prosecuting this action

19

vigorously and who have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interests that are materially adverse to those of the Class.

80.     Because most Class Members reside in Maine and Defendants' wrongful conduct occurred primarily in Maine, it is desirable for the Class Members to concentrate all claims in the United States District Court, District of Maine.

81.     WHEREFORE, the Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court certify the proposed class and the respective subclasses.

**COUNT I**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") – 18 U.S.C. §§ 1962(c), 1964(c)**

82.     Plaintiffs repeat and reallege the allegations in every other paragraph of this Complaint as if fully set forth herein.

83.     Beginning in 2011 and continuing until the present, RICO persons and defendants Kevin Dean, Emile Clavet, and, in May 2016, Spark HoldCo ("RICO Defendants"), participated in, and conducted, the conduct of an enterprise through a pattern of racketeering by repeatedly engaging in mail and wire fraud.  RICO Defendants' violations of 18 U.S.C. § 1962(c) have caused, and continue to cause, Plaintiffs and Class Members to suffer significant economic harm.

**A.     Enterprise**

84.     Electricity Maine, LLC and parent company Provider Power, LLC comprise the Electricity Maine Promotional Enterprise ("Enterprise").  Together, with their employees, officers, consultants, suppliers, vendors, and affiliates, these entities constitute an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

85.     Both members of the Enterprise share the common purpose of conducting RICO Defendants' fraudulent, deceptive, and misleading advertising scheme to (1) promote Electricity Maine's electricity supply services and induce Plaintiffs and Class Members to purchase those services instead of standard-offer electricity services or the services of other CEPs and (2) fraudulently and deceptively increase the price that Plaintiffs and Class Members paid for Electricity Maine's services.   At the direction of the RICO Defendants, the Enterprise has endeavored to achieve the common purpose since 2011 and has succeeded in enrolling nearly 160,000 residential and small-business electricity supply customers in Electricity Maine's services and maintaining that customer base through automatic renewals.

86.     Electricity Maine and Provider Power, as members of the Enterprise, are completely and systematically intertwined.  Functioning as a single unit, they share employees, consultants, officers, management, facilities, and infrastructure, to achieve the Enterprise's common purpose.  Although the Enterprise has expanded substantially since its inception in 2011, its basic structure and organization remains unchanged.

87.     Under the direction of RICO Defendants, the Enterprise functions through a hierarchical corporate decision-making structure controlled by Emile Clavet, Kevin Dean, and, subsequent to May 2016, Spark.  The Enterprise does not make decisions on an ad-hoc basis and its members, similarly, do not operate at arms-length; instead, they function as a cohesive unit to achieve the Enterprise's common purpose.

88.     RICO Defendants participate in the Enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of interstate wire and mail

21

communications to execute a scheme to defraud Plaintiffs and Class Members—all in violation of 18 U.S.C. § 1962(c).  These predicate acts are performed by, or at the direction of, RICO Defendants, with each successfully-completed predicate act furthering the common purpose.

89.    For example, RICO Defendants Clavet and Dean have both personally made fraudulent statements and engaged in fraudulent advertising.  RICO Defendant Spark has, similarly, performed predicate acts since acquiring Electricity Maine and directed and incentivized the Enterprise to perform predicate acts by promising significant financial rewards if the Enterprise enrolls or retains additional customers—a goal that it endeavors to achieve by engaging in wire and mail fraud in violation of 18 U.S.C. § 1341 and 1343.

90.    Standing alone, and without RICO Defendants' fraudulent scheme, the Enterprise could function as a legitimate—albeit less successful—business.  Without RICO Defendants' pattern of racketeering, the Enterprise would have exhibited business characteristics similar to other CEPs—small market share, low profits, and limited success.  But because of RICO Defendants' predicate acts, or those conducted at their behest, the Enterprise grew rapidly and allowed RICO Defendants to reap enormous profits at Maine ratepayers' expense.

91.    Beginning in 2011, and until May 3, 2016, RICO Defendants Emile Clavet and Kevin Dean exclusively controlled the Enterprise.  On May 3, 2016, Spark HoldCo purchased the Enterprise from Clavet and Dean, who remain employees of, or consultants to, the Enterprise.  All three RICO Defendants currently share control of the Enterprise.

92.    RICO Defendants Emile Clavet and Kevin Dean are natural persons distinct from the Enterprise.  Clavet and Dean—first as controlling members of Provider Power and, after May

2016, as employees or consultants of both Enterprise entity members—use the Enterprise as a vehicle to conduct their fraudulent scheme.

93.    RICO Defendant Spark is a distinct corporate entity from either Enterprise member and from the Enterprise itself.  Spark is a Texas-based energy company that, prior to May 2016, was unaffiliated with the Enterprise.

94.    Upon seizing control of the Enterprise from RICO Defendants Clavet and Dean by purchasing Electricity Maine from Provider Power, Spark, instead of merely delegating authority and control over Electricity Maine through legitimate channels of corporate governance, used significant financial incentives—provided by Spark to Enterprise member Provider Power and not its subsidiary, Electricity Maine—to control the Enterprise outside the corporate structure and enhance the fraudulent scheme previously controlled exclusively by RICO Defendants Clavet and Dean.

95.    Spark's control over the Enterprise's racketeering activities through financial incentives is entirely distinct from its inherent corporate control over Electricity Maine's regular business activities.  Sparks' predicate acts involving door-to-door sales are controlled and monitored by Spark from offices in Texas and through vendor entities operating outside of Maine.

96.    Using its control over the Enterprise—and with knowledge of the Enterprise's operations and the manner in which it automatically reenrolls customers without notice—Spark directed and incentivized the Enterprise to intensify the fraudulent scheme.  Specifically, Spark provided Enterprise member Provider Power with (1) $2 million in working capital to acquire and retain customers and (2) a $9 million incentive encouraging the Enterprise to retain and enroll as

many customers as possible through the below-described racketeering activities.  Spark urged the Enterprise, in May 2016, to increase its average customer kilowatt-per-hour-rate to over $0.10/kWh, despite a standard-offer rate of approximately $0.06/kWh at that time.

97.     Additionally, Spark, after acquiring Electricity Maine, began employing door-to-door sales agents to commit the predicate acts discussed below and fraudulently enroll Maine consumers in Electricity Maine's electricity supply services at rates exceeding the standard offer. Spark alone, and not Electricity Maine, controls the door-to-door fraudulent scheme.   When Spark's agents succeed in perpetrating their fraudulent acts, they use the Enterprise to complete the enrollment process and switch consumers from standard offer service to Electricity Maine.

98.     By directly committing predicate acts alongside, and through the Enterprise, Spark achieves significant profit in an otherwise non-profitable business.

99.     By using financial incentives to control the Enterprise outside the corporate parent-subsidiary relationship between Spark and Electricity Maine, and by directly committing predicate acts that benefit the Enterprise, RICO Defendant Spark uses its control of the Enterprise to profit from, and to focus and enhance, the Enterprise's pattern of racketeering.  At the same time, RICO Defendant Spark keeps Electricity Maine as the face of its business in Maine in an attempt to insulate itself from liability, avoid the constraints of legitimate corporate governance, and conceal its activity in Maine energy markets from state and federal regulators and consumers—all of which allow it to facilitate the fraudulent scheme.

24

**B.      Specific Acts of Mail and Wire Fraud**

100.    RICO Defendants, through the Enterprise's conduct, committed numerous acts of mail and wire fraud in violation of 18 U.S.C. § 1341 and 1343 by using interstate mail and wires with specific intent to execute their fraudulent scheme.  RICO Defendants' scheme is reasonably calculated to deceive persons of ordinary prudence and comprehension in order to part Plaintiffs and Class Members from their money and to induce them to surrender their legal rights.  The scheme departs from any known standard of fair play and honest dealing.  The scheme includes nondisclosure, deliberate falsehoods and misleading communications.  Each nondisclosure, misrepresentation, and misleading statement is embedded in a pattern of deception and fraud reasonably calculated to induce reliance.

101.    RICO Defendants' predicate acts fall into three different categories.  First, a top-down marketing scheme where RICO Defendants Dean and Clavet used the Enterprise to create an advertising campaign promising prices lower than utility-provided standard offer service. Between 2011 and March 2013, RICO Defendants used the Enterprise to distribute their fraudulent advertising materials through media outlets around Maine.  Second, RICO Defendants omitted material information from the renewal notices when they had a legal duty to provide information about their renewal pricing.  By omitting pricing information, RICO Defendants were able to shroud their price increases from consumers during the renewal process.  Third, RICO Defendant Spark uses an army of door-to-door sales agents to switch customers from standard offer service with a set of common misrepresentations.

### a.    Fraudulent Advertising

102.    Defendants' specific acts of mail and wire fraud during its media advertising campaign, include but are not limited to, the following statements:

a.  In August 2011, Emile Clavet made statements to the Lewiston Sun Journal that were published on August 14, 2011.  These statements represented that Electricity Maine's electricity rates "will always beat the standard offer.  You'll never, ever pay more than the standard offer . . . ."  This statement was published using interstate mail and wire communications in that it was published on the Lewiston Sun Journal's website and mailed to Lewiston Sun Journal subscribers.  In causing Electricity Maine to make these statements, RICO Defendants were aware, and intended, that the Lewiston Sun Journal would publish the fraudulent and misleading statement on or about August 14, 2011, on its website using interstate wires.

b.  In the same August 14, 2011, Lewiston Sun Journal article, Electricity Maine's customer service project manager Danielle Beckwith represented that "there is no catch and no gimmicks," "[t]here's just a better rate."  This statement was published using interstate mail and wire communications in that it was published on the Lewiston Sun Journal's website and mailed to Lewiston Sun Journal subscribers.  In causing Electricity Maine to make these statements, RICO Defendants were aware, and intended, that the Lewiston Sun Journal would publish the fraudulent and misleading statement on or about August 14, 2011, on its website using interstate wires.

c.  Following Emile Clavet's and Danielle Beckwith's statements in the August 14, 2011, Lewiston Sun Journal article, Electricity Maine republished the fraudulent statements on their website using interstate commerce.

d.  In November 2011, Electricity Maine distributed a set of talking points to radio stations around Maine promising consumers that Electricity Maine would save them "drastic amounts of money in comparison to the standard offer";  that Electricity Maine would "always beat the standard offer"; "there are no gimmicks, scams, or no catch."  These talking points were delivered to, and broadcast by, at least Cumulus Media, Blueberry Broadcasting, Portland Radio Group, and Town Square Media. In causing Electricity Maine to distribute these talking points to radio stations, RICO Defendants were aware, and intended, that the radio stations would make fraudulent and misleading statements using interstate wires.

e.  In early 2012, Electricity Maine distributed a set of talking points to radio stations around Maine similar to those talking points distributed in 2011.  These statements promised consumers that Electricity Maine would save them "money in comparison to the standard offer"; that Electricity Maine would "beat the standard offer"; "there are no gimmicks, scams, or no catch."  These talking points were delivered to, and broadcast by, at least Cumulus Media, Blueberry Broadcasting, Portland Radio Group, and Town Square Media. In causing Electricity Maine to distribute these talking points to radio stations, RICO Defendants were aware, and intended, that the radio stations would make fraudulent and misleading statements using interstate wires.

f.  Emile Clavet and Kevin Dean appeared on television show 207TV in early 2012 and represented that Electricity Maine's prices were lower than the standard offer; that Electricity Maine Customers could save over $130 a year; that Electricity Maine customers would be notified of any price increases; and that Electricity Maine's services did not come with a "catch,"—"there really isn't" Dean represented.   This statement was published using interstate wire communications in that it was televised.  In making these statements on live television, RICO Defendants were aware, and intended, that Portland, Maine NBC affiliate WCSH Channel 6 would transmit the fraudulent and misleading statement in early 2012.  RICO Defendants, through Electricity Maine, later used interstate wire communications on February 22, 2012, to publish a recording of Clavet's and Dean's appearances on 207TV on Electricity Maine's YouTube channel.

g.  Throughout 2012 and until at least March 2013, Electricity Maine ran a series of television advertisements on major network channels in which Electricity Maine spokeswoman Kiley Bennet represented that Electricity Maine's electricity services were lower than the standard-offer rate.  The advertisements stated "if your electricity bill says standard offer, you're paying too much" and "[c]hange now and save every month."  In causing Electricity Maine to make these fraudulent and misleading statements, RICO Defendants were aware and intended that Portland, Maine NBC affiliate WCSH Channel 6 and other Maine network television affiliates would use interstate wire communications to transmit Kiley Bennet's statements.

h.  In late September or early October 2012, Kevin Dean made statements to the Bangor Daily News regarding Electricity Maine's prices that were published on October 2, 2012.  He maintained that Electricity Maine "will always offer the lowest price."  This statement was published using interstate mail and wire communications in that it was published on the Bangor Daily News website and

27

mailed to Bangor Daily News subscribers.  In causing Electricity Maine to make these statements, RICO Defendants were aware, and intended, that the Bangor Daily News would publish the fraudulent and misleading statement on or about October 2, 2012, on its website using interstate wires.

i.    On January 7, 2013, Electricity Maine distributed the following talking point to at least four Maine radio station syndicates—Cumulus Media, Blueberry Broadcasting, Portland Radio Group, and Town Square Media—for a thirty-second on-air promotion:  "Nearly 2 hundred thousand Mainers can't be wrong. Electricity Maine was the first and now the largest competitive electricity supplier provider in Maine.  In 2013 Electricity Maine customers will combine to save 6 point 8 million dollars."  Electricity Maine distributed the same talking point on January 18, 2013.  These statements were transmitted using interstate wire communications and subsequently made part of radio broadcasts.  In causing Electricity Maine to make these statements, RICO Defendants were aware, and explicitly instructed, that the radio groups transmit the fraudulent and misleading statements in thirty-second advertising clips using interstate wires.

j.    On January 18, 2013, Electricity Maine used email to distribute talking points to at least the same four Maine radio station groups representing that "In 2013 customers will combine to save 6.8 million!"  These statements were transmitted using interstate wire communications and subsequently transmitted as part of radio broadcasts. In making these statements, RICO Defendants were aware, and explicitly instructed, that the radio groups transmit the fraudulent and misleading statements in thirty-second advertising clips using interstate wires.

k.    On February 14, 2013, Electricity Maine distributed talking points to at least the same four Maine radio station groups telling Maine residential electricity customers to "Just grab your power bill, if on page 2 it says 'Standard Offer' you're paying too much."  These statements were published using interstate wire communications in that they were part of a radio broadcast.  These statements were transmitted using interstate wire communications and subsequently made part of radio broadcasts.  In making these statements, RICO Defendants were aware, and explicitly instructed, that the radio groups transmitted the fraudulent and misleading statements in thirty-second advertising clips using interstate wires.

103.    These statements were fraudulent and deceptive because Electricity Maine, aggregately, has not, and never intended to, save its customers money as it promised and

represented; instead, Electricity Maine has increased its residential electricity customers' bills by at least $58 million through 2016.  RICO Defendants made these statements, or caused them to be made, with knowledge of their falsity or with reckless disregard for the truth.  These statements, further, omit information regarding material risks, consequences, and other negative aspects of Electricity Maine's services.

104.   RICO Defendants, with intimate knowledge of the power industry, were aware of commodity markets' volatility at the time they made, or caused Electricity Maine to make, the above-statements and were aware that their promised power prices would not always be lower than the standard-offer rate—or even beat the standard offer for any significant period of time.  RICO Defendants deliberately misrepresented the price of Electricity Maine's residential electricity services as part of a scheme to deprive Plaintiffs and Class Members of their property.

105.   RICO Defendants were aware at the time that they caused Electricity Maine to make these representations that Electricity Maine could only succeed as a business and recoup the promotional costs of recruiting each customer by raising Electricity Maine's rates above the standard offer.

106.   RICO Defendants were incentivized to misrepresent the price of Electricity Maine's services and omit from their advertising and marketing the true cost of their services because RICO Defendants' business model is entirely dependent on its ability to (1) promise unrealistic price savings and (2) automatically reenroll customers into new contracts at rates that allow them to make a profit.  Without engaging in fraudulent and misleading marketing and without the ability to deceptively reenroll customers—and reenroll them at rates greatly exceeding

the standard offer—Electricity Maine would quickly fail or, at a minimum, would not profit. For this reason, RICO Defendants actively concealed and withheld, and caused others to conceal or withhold, accurate information regarding the actual cost of Electricity Maine's electricity supply services.

107.    Defendants used interstate wires—through Electricity Maine's website or by telephone—to consummate their fraudulent scheme and enroll customers in their services.

**b.    Fraudulent Door-to-Door Sales**

108.    Defendants' specific acts of mail and wire fraud during its door-to-door campaign, include but are not limited to, the following statements:

a.    On August 31, 2017, two Spark agents approached an apartment in West Paris and asked to speak with the apartment's 93-year-old occupant, Cynthia Lamb. Ms. Lamb lives in an apartment complex occupied by other elderly, and disabled, tenants.

The two unidentified Spark agents told Ms. Lamb they were from CMP and investigating overcharges. They asked for her CMP bills and other information about her account. Upon reviewing her information, the Spark agents used intentionally used wire communications to call a third-party call center in Arizona and enroll Ms. Lamb in Electricity Maine's services. During the call, Ms. Lamb struggled to understand who she was speaking with; she ultimately complied with the Spark agents' requests that she confirm the CMP overcharges—by which she unknowingly enrolled with Electricity Maine.

The Spark agents proceeded to work the apartment building defrauding its other residents. When confronted by law enforcement, the Spark agents admitted that they worked for Spark energy and were going door to door on behalf of Electricity Maine. The Spark agents provided law enforcement with fake telephone numbers.

b.    In late November 2017, a Spark agent approached a home located at 22 Office Drive in Bath, Maine owned by Elizabeth Seavey. The agent—who did not provide a name—was wearing a CMP badge. He told Ms. Seavey

that he was a CMP auditor and that CMP had overcharged her and that she
may be eligible for a refund.

The auditor informed her that an error with CMP's new meters resulted in
overcharges.  The auditor then asked for Ms. Seavey's CMP bill to confirm
the overcharges.  Although Ms. Seavey could not find a recent CMP bill,
the auditor assured her that her household was overcharged and appeared to
make a quick call on his phone after which he confirmed that Ms. Seavey
had indeed been overcharged.

The Spark agent then intentionally used wire communications to call a third-
party call center in Arizona and to attempt to enroll Ms. Seavey in
Electricity Maine's services.  During the call, Ms. Seavey realized that man
standing in her kitchen was not from CMP and asked him to leave her home.

c.  On November 26, 2017, a purporting to represent CMP approached Plaintiff
Tilton's house.  The Spark agent purporting to represent CMP informed Mr.
Tilton that, "due to a malfunction," CMP had overcharged Mr. Tilton.  The
agent asked for Mr. Tilton's account information.  Upon reviewing his
information, the Spark agent intentionally used wire communications to call
a third-party call center in Arizona.

Unbeknownst to Mr. Tilton, Spark's agent, on that call, enrolled him with
Electricity Maine at a rate that exceeded the standard offer by thirty percent.

d.  On January 13, 2018, a Spark agent approaching the home of Phillip
Randall at 16 Summer Street in Norway, Maine.  The agent was wearing
his CMP badge and informed Ms. Randall that he was working for CMP
checking customers' bills for overcharges.  The agent asked to see the
Randalls' CMP bill.  Ms. Randall obliged.  Upon reviewing her information,
the Spark agent intentionally used wire communications to call a third-party
call center in Arizona and enroll Ms. Randall in Electricity Maine's
services.

After the call, Mr. Randall realized that the agent did not work for CMP and
contacted the Norway Police Department.  When Officer Federico of the
Norway Police Department arrive on the scene the agent claimed to
represent CMP.  When Officer Federico asked why a CMP employee was
working on Saturday, the agent responded that he actually worked for Spark
Energy who owns CMP and the power plant.  A copy of Officer Federico's
report is attached as (Ex. B).

31

e.   In mid-April, a Spark agent approached a home owned by Bonnie and Daniel DeFazeio and located at 28 Elm Street in Norway, Maine. The individual stated that he was with CMP.  The Spark agent introduced himself as John and told them that he was going around the neighborhood because of high electricity rates and problems that CMP is having.  He asked to see the DiFazio's CMP bill.  Upon reviewing the DiFazio's CMP account information, the Spark agent intentionally used wire communications to call a third-party call center in Arizona and enroll Ms. Randall in Electricity Maine's services.

109.   Since January 2017, Spark has been committing fraudulent acts like these all over the state.  Similar acts continue to occur—and cause Class Members harm—every day.

110.   Since at least March 2017, Spark's door-to-door fraud has generated significant complaints to CMP and law enforcement.  Instead of taking meaningful action, however, Spark encourages its agents continue their fraudulent practices.  When questioned by law enforcement, CMP, and regulatory authorities, moreover, Spark falsely replied that it had terminated an agent caught posing as a CMP auditor.

### c.   Omissions During the Renewal Process

111.   Once RICO Defendants managed to acquire over 160,000 customers through the advertising campaign alleged above, they used the Enterprise to enroll these customers at rates that significantly exceeded the standard offer.  Instead of enrolling customers on the date that their prior contract expired, they would group Plaintiffs and Class Members and, using an automated process, reenroll them in large batches that sometimes exceeded 60,000 customers.  For any particular renewal period, all renewed Plaintiffs and Class Members received identical renewal notices and were enrolled at the same price.

32

112.     At the same time they renewed Electricity Maine customers, RICO Defendants were aware of standard offer pricing, and that their prices greatly exceeding the standard offer.

113.     Similarly, RICO Defendants are aware that over half of email renewal notices that sent are never read by Electricity Maine customers.

114.     In the renewal process, RICO Defendants intended to reenroll as many customers as possible at as high a rate as possible.  To achieve that goal, RICO Defendants caused the Enterprise to intentionally withhold pricing information and otherwise shroud price increases.

115.     Because RICO Defendants automatically renew any customer that fails to act within ten days of receiving their renewal notice, RICO Defendants deliberately withheld information to encourage inaction.

116.     RICO Defendants Dean, Clavet, and later, Spark, would determine the exact language that each form of renewal notice contained and what pricing information to include—or not include.

117.     Following RICO Defendants' approval of form renewal notices, they used the Enterprise to distribute the notices to Electricity Maine through an automated process.

118.     Until January 26, 2015, PUC regulations required that all renewal notices accompany Plaintiffs and Class Members bill from their respective utility provider—CMP or Bangor Hydro.

119.     Between August 7, 2013, and January 26, 2015, Defendants' agreement with the PUC required renewal notices to disclose current prices in addition to the renewal price.  RICO Defendants reached this agreement with the PUC to avoid further investigation into their

33

advertising practices. Because of their agreement with the PUC, Defendants had a legal duty to disclose the agreed-upon pricing information. Defendants' intentionally omitted this pricing information to renew the maximum number of customers at rates that exceed the standard offer. Tellingly, Defendants included the required information when a customer's renewal rate was lower than the standard offer but omitted the same information when they sought to enroll customers at rates exceeding the standard offer.

120.     Similarly, RICO Defendants never enclosed Plaintiffs and Class Members' renewal notices with their utility bills—as required by PUC regulation.

121.     In addition to not disclosing the pricing information required by the PUC, RICO Defendants required the Enterprise to distribute renewal notices that informed consumers that their new rate was "competitive" and would "protect" consumers from rising electricity rates.

122.     For example, the renewal notices sent to Plaintiffs Veilleux and Chon in October 2014, which contain no comparison to customers' current rate or the standard offer, stated

> "[w]e want to thank you for your business and let you know that your account with Electricity Maine is renewing in December 2014. To protect you from rising electricity rates, we have secured competitive, 24 month fixed contract for you at $0.11394 /kWh, ending on your meter read date in December, 2016. There is no action required on your part."

123.     The standard offer at that time—of which Defendants monitored closely—was $.0744 /kWh.

124.     On the other hand, when Electricity Maine was still acquiring customers—and therefore offering lower rates—it proudly disclosed to customers their current rates, the standard-

offer rate, and the renewal rate.  For example, in January 2013, Electricity Maine sent Plaintiff

Veilleux a reenrollment notice stating

> [j]ust a quick letter to let you know that your electricity rate will be going down again this year in your auto renewal plan through Electricity Maine!  Because of our buying capability, we were able to secure a rate of 6.823 cents/kWh for CMP customers beginning on your renewal date through your meter read date in November, 2013.  This is down from 7.07 cents/kWh and continues to be lower than the Standard Offer.  This means that you will continue to save on the power supply portion of your electric bill.

RICO Defendants intended not to disclose Electricity-Maine customers' terms and rates of reenrollment because those customers, upon learning the true price of Electricity Maine's services, would have abandoned the CEP for standard-offer service and the Enterprise would have quickly failed.

## C.    Pattern of Racketeering

125.    RICO Defendants' repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, extend over a period of years from 2011 until the present, involve distinct and independent criminal acts and episodes, and constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

126.    The racketeering acts—wire and mail fraud—are described above in this Amended Complaint.

127.    The racketeering acts are related and amount to, or pose a threat of, continued criminal activity because RICO Defendants, through the Enterprise, have conducted their fraudulent scheme since 2011.

35

128.   The racketeering acts are a regular way that the Enterprise conducts the RICO Defendants' ongoing illegitimate business.  If the Enterprise did not facilitate RICO Defendants' fraudulent scheme, it would operate as merely another unprofitable CEP.

129.   The racketeering acts are performed at the direction, or the ultimate direction, of RICO Defendants.  RICO Defendants Dean and Clavet have performed themselves, or directed others to perform, many of the predicate acts.

130.   RICO Defendant Spark, with knowledge of how the Enterprise recruits and reenrolls customers, provided the Enterprise with $2 million of working capital and $9 million of incentives to further and intensify the fraudulent scheme.  RICO Defendants agreed to a customer acquisition budget of up to eighty dollars per customer, knowing that, if the Enterprise provided electricity supply services at a rate competitive with the standard offer, that investment could never be recouped.

131.   Similarly, RICO Defendant Spark is operating a door-to-door sales force throughout the state and engaging in the fraudulent acts similar to those listed above on a daily basis.

132.   The racketeering acts share common methods of fraudulent and misleading advertising and omissions to defraud victims who purchase residential and small-business electricity supply services from Electricity Maine.

133.   The acts committed against Plaintiffs were not isolated, but are related to those committed against at least 160,000 Maine residential and small-business electricity supply customers.

36

134.    The acts described continue today and are an imminent and daily threat to Maine residential and small-business electricity supply customers.  Spark's door-to-door sales agents are currently operating throughout the state and engaging in the fraudulent acts similar to those listed above on a daily basis.

**D.    Injury**

**135.**    Plaintiffs have been harmed by reason of RICO Defendants' fraudulent scheme and the above-described pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  This harm was not discoverable to Plaintiffs and Class Members until at least early 2013, when Electricity Maine began reenrolling its customers' into new, higher-rate, contracts, without notice, and Plaintiffs' and Class Members' monthly power bills began to increase.

136.    RICO Defendants' wrongful acts and pattern of racketeering proximately caused Plaintiffs' and Class Members' injuries because Plaintiffs and Class Members, relying on RICO Defendants' fraudulent misrepresentations and other predicate acts, purchased residential and small-business electricity supply services from Electricity Maine instead of from utility providers at the standard-offer rate.  Converting Plaintiffs and Class Members from standard offer service to Electricity Maine's electricity supply services was the primary and intended purpose of RICO Defendants' fraudulent scheme.

137.    As a direct result of RICO Defendants' fraudulent scheme, Plaintiffs and Class Members sustained additional economic harm because they were automatically reenrolled, at prices greatly exceeding the cost of standard-offer service.

37

138.    Without RICO Defendants' misconduct, Plaintiffs and Class Members would not have purchased Electricity Maine's electricity supply services or have reenrolled in those services at rates exceeding the standard offer.  Because electricity is a homogenous good that requires its purveyors to compete entirely on price, if RICO Defendants disclosed the true cost of their residential electricity services—or not false posed as CMP representatives—Electricity Maine would have failed to enroll any appreciable number of customers.  Instead, as a direct consequence of RICO Defendants' fraudulent scheme, Electricity Maine enrolled over 160,000 residential electricity customers and charged at least $58 million more than those customers would have paid for standard-offer service—the service that they would have received without RICO Defendants' fraud.

139.    WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against RICO Defendants; award Plaintiffs and Class Members three times their compensatory damages in an amount to be proven at trial, punitive damages, reasonable attorney fees, and costs; enjoin RICO Defendants from using the Enterprise to engage in illegal conduct; and grant Plaintiffs and Class Members any other relief the Court deems just and proper.

## COUNT II
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") – 18 U.S.C. §§ 1962(d), 1964(c)

140.    Plaintiffs repeat and reallege the allegations in every other previous paragraph of this Complaint as if fully set forth herein.

141.     In addition to participating in and directing the conduct of the Electricity Maine Promotional Enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c), RICO Defendants Emile Clavet, Kevin Dean, and Spark, conspired to violate Section 1962(c) in violation of 18 U.S.C. § 1962(d).

142.     Beginning in 2011, RICO Defendants Clavet and Dean conspired to violate Section 1962(c), as alleged in Count I.  This agreement included performing predicate acts, and causing others to perform predicate acts; using the Enterprise to switch 160,000 customers from standard offer service to Electricity Maine's electricity supply services; and then reenrolling those customers exorbitant rates—masterminding a classic bait and switch scheme that deprived Maine consumers of over $58 million.

143.     In 2016, RICO Defendant Spark, joined Clavet and Dean in their conspiracy to violate Section 1962(c).

144.     RICO Defendant Spark is a sophisticated operator of competitive electricity supply companies in deregulated energy markets around the country.  As alleged above, Spark and its other subsidiaries use fraudulent door-to-door sales and fraudulent reenrollment procedures to enroll and retain customers in at least five other states.  Because of Spark's misconduct in these other states, Spark and related entities are subject to numerous other class action lawsuits, and regulatory enforcement actions.  The allegations in these cases and regulatory actions mirror those in this case—fraudulent advertising; fraudulent door-to-door promotion; and a deceptive renewal process that increases customers' rates exorbitantly as part of a bait and switch scheme.

145.     In purchasing Electricity Maine, Spark was not acquiring a company, but knowingly buying an existing scheme that it could use as a platform to launch its own fraud here in Maine.  In ratifying Clavet and Dean's prior unlawful acts, Spark intended to profit from their past violations Section 1962(c)—fraudulent marketing and reenrollment acts used to acquire Electricity Maine customers—and leverage that customer base to profit by committing future violations of Section 1962(c).

146.     To that end, Spark entered into an agreement with RICO Defendants Clavet and Dean under which Spark agreed to perform predicate acts and agreed to direct others to perform predicate acts.  RICO Defendants' agreement to violate Section 1962(c) had two objectives— acquiring new Electricity Maine customers through fraudulent representations and using Dean and Clavet's fraudulent enrollment process to retain current customers at prices exceeding the standard offer.

147.     To accomplish the first objective, Spark agreed to employ a team of sales agents to conduct fraudulent door-to-door sales Maine—primarily by posing as CMP representatives.  Spark agreed to recruit these door-to-door agents through staffing agencies, including Master Door to Door; train them; and pay them a commission for every customer acquisition.

148.     As alleged above, Spark made good on its agreement and its agents are currently operating in Maine wearing CMP vests and sporting CMP badges; representing themselves as CMP employees; and committing other fraudulent acts.

149.     To accomplish the second goal, Spark embraced Dean and Clavet's objective of using the Enterprise to enroll and retain the maximum number of Electricity Maine customers at

40

as high a rate as possible through the predicate acts discussed in Count I.  In addition to overseeing the renewal process directly, Spark sought to further Clavet and Dean's violations of 18 U.S.C. § 1962(c) by providing Dean and Clavet with the means—$2 million working capital—and the incentive—up to $9 million—to ensure that Clavet and Dean used the Enterprise to reenroll the maximum number of customers at the highest possible prices.  Spark structured these incentives to ensure that Electricity Maine's customers were reenrolled, and reenrolled at rates that greatly exceed the standard offer.

150.    These payments were made directly to Dean and Clavet with the understanding that they would continue to operate the renewal process in a deceptive manner that would shroud prices increases and allow Electricity Maine to retain customers at high rates.  The following matrix outlining Spark's incentives to Clavet and Dean appears in the May 2016 asset purchase agreement for Electricity Maine.

| WASP (¢/kWh) | Customer Count (000s) - As of May 31, 2017 | | | |
|---|---|---|---|---|
|  | 110 – 120 | 120 – 130 | 130 – 140 | 140+ |
| 9.0 – 9.5 | $0.0 | $1.0 | $3.0 | $4.0 |
| 9.5 – 10.0 | $1.0 | $2.0 | $4.0 | $4.0 |
| 10.0 – 10.5 | $2.0 | $3.0 | $4.0 | $4.0 |

*Amounts in table represent millions of dollars*

151.    Following Spark's May 2016 acquisition, Spark enhanced the maximum incentive to $9 million.  Clavet and Dean were able to retain enough customers at high rates to earn a $5.5 million fee.

41

152.     Plaintiffs and Class Members have been harmed because of the pattern of racketeering that RICO Defendants conspired to commit in violation of 18 U.S.C. § 1962(d).

153.     Because of RICO Defendants' conspiracy, Plaintiff Tilton was enrolled in November 2017 by one of Spark's agents posing as a CMP representative.

154.     Because of RICO Defendants' conspiracy, Plaintiffs and Class Members remained Electricity Maine customers instead of returning to standard-offer service.

155.     Converting Plaintiffs and Class Members from standard-offer service to Electricity Maine's electricity supply services; preventing Electricity Maine customers from returning to standard-offer service; and increasing Electricity Maine customers' rates through a pattern of racketeering activity were the primary and intended purposes of RICO Defendants' conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

156.     For example, Electricity Maine, as part of the reenrollment scheme directed by Spark, reenrolled Plaintiff Rocky Coast in late summer of 2016 at a rate substantially exceeding the standard offer.  Plaintiff Veilleux, similarly, received an email on June 28, 2017, seeking to enroll her at $0.1099 /kWh—a rate almost double the current standard-offer rate.

157.     Without RICO Defendants' conspiracy, and subsequent predicate acts, Plaintiffs and Class Members would not have enrolled with Electricity Maine, or would have either left Electricity Maine for standard-offer service.

158.     WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against RICO Defendants; award Plaintiffs and Class Members three times their compensatory damages in an

42

amount to be proven at trial, punitive damages, reasonable attorney fees, and costs; enjoin RICO Defendants from using the Enterprise to engage in illegal conduct; and grant Plaintiffs and Class Members any other relief the Court deems just and proper.

**COUNT III**
**VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT — 5 M.R.S. § 207**

159.    Plaintiffs repeat and reallege the allegations in every other paragraph of this Complaint as if fully set forth herein.

160.    Defendants engaged in, and continue to engage in, false, unfair, and deceptive business practices, advertising, and marketing in violation of 5 M.R.S. § 207.  These acts include but are not limited to:

    a.    Advertising and marketing that Electricity Maine's prices would always be lower than the standard offer;

    b.    Advertising and marketing Electricity Maine's prices as lower than the standard offer;

    c.    Failing to disclose the risks associated with Electricity Maine's product;

    d.    Auto renewing Plaintiffs' and Class Members' contracts without notice;

    e.    Advertising and marketing that Electricity Maine has saved customers millions of dollars;

    f.    Advertising and marketing that Electricity Maine will save customers millions of dollars in the future;

    g.    Providing teaser rates that automatically increase without notice;

    h.    Otherwise increasing Plaintiffs' and Class Members' electricity rates without notice; and

    i.    Refusing to allow Electricity Maine customers to terminate auto-enrolled contracts.

      j.    Posing as CMP representatives, and using other fraudulent door-to-door tactics, to enroll customers.

161.    Defendants' business practices, advertising, and marketing, cause, or are likely to cause, substantial injury in that Plaintiffs and Class Members have suffered significant economic harm.

162.    Because of the extremely deceptive nature of the Defendants' conduct—including Defendants' failure to provide Plaintiffs and Class Members with renewal notices—this harm is not reasonably avoidable by Plaintiffs and Class Members.

163.    Defendants' fraudulent and misleading business practices provide little or no benefit to consumers.  Despite its increased price, Electricity Maine's electricity supply services, are identical to, and provide no additional benefit over, its competitors' services.

164.    On September 26, 2016, Plaintiff Katherine Veilleux, through counsel, demanded relief from Defendant Electricity Maine in writing pursuant to 5 M.R.S. § 213(1-A) (Ex. C). Electricity Maine did not respond.

165.    WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against all Defendants and award Plaintiffs and Class Members actual damages in an amount to be proven at trial, reasonable attorney fees, costs, restitution, and injunctive relief prohibiting Defendants from (a) engaging in unfair and deceptive trade practices, (b) charging electricity rates greater than the standard-offer, and (c) charging early termination fees; and any other relief that the Court deems just and proper.

44

## COUNT IV
## UNJUST ENRICHMENT

166.    Plaintiffs repeat and reallege the allegations in every other paragraph of this Complaint as if fully set forth herein.

167.    As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from payments made by Plaintiffs and Class Members for residential electricity services at rates greater than standard-offer service.

168.    Defendants have voluntarily accepted and retained these payments, with full knowledge and awareness that, as a result of their wrongdoing, Plaintiffs and Class Members were overpaying for residential electricity services.

169.    By accepting payments for residential electricity services at rates greater than the standard-offer rate, Defendants are unjustly enriched.

170.    WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against all Defendants and award restitution of Defendants' wrongful profits, revenues, and benefits in an amount to be proven at trial and award any other relief that the Court deems just and proper.

## COUNT V
## CIVIL CONSPIRACY

171.    Plaintiffs repeat and reallege the allegations in every other paragraph of this Complaint as if fully set forth herein.

172.     Defendant Spark conspired with Defendants Clavet, Dean, Electricity Maine, and Provider Power, to fraudulently enroll and reenroll Maine consumers in Electricity Maine's supply services as alleged above in this Complaint.

173.     Spark purchased Electricity Maine with the intent to implement the same fraudulent scheme it employs in other states.  In buying Electricity Maine, Spark agreed to engage in the fraudulent and deceptive acts alleged above in violation of 5 M.R.S. § 207 and Maine common law; and demanded that others do the same.

174.     The conspiracy to violate 5 M.R.S. § 207 and the other causes of action alleged above was intended to benefit Spark.

175.     In agreeing to conspire with the other Defendants, Spark ratified Defendants' violations of 5 M.R.S. § 207 and Maine common law dating back to 2011.  In ratifying these prior unlawful acts, Spark intended to profit from Defendants' past misconduct in enrolling and reenrolling Maine consumers in Electricity Maine's services and leverage that customer base to commit future fraudulent conduct.

176.     WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated, respectfully request that the Court enter judgment jointly and severally against all Defendants for Defendants' conduct in violation of Maine common law and 5 M.R.S. § 207 since 2011, award restitution of Defendants' wrongful profits, revenues, and benefits in an amount to be proven at trial and award any other relief that the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on each and every count so triable.

Dated December 26, 2018, at Portland, Maine.

Respectfully submitted,

    /s/ Benjamin Donahue
Thomas F. Hallett
Benjamin N. Donahue
Attorneys for the Plaintiffs and Class Members
HALLETT WHIPPLE WEYRENS
Six City Center
PO Box 7508
Portland, Maine 04112-7508
(207) 775-4255
bdonahue@hww.law


    /s/ Robert Cummins
Robert P. Cummins
Attorney for Plaintiffs and Class Members
The Cummins Law Firm
33 North Dearborn Street
Chicago, Illinois 60602
312-662-6321
rpc@cumminslawfirm.com

47

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin N. Donahue, Esq., certify that on December 26, 2018, I electronically filed the foregoing Third Amended Complaint with the Clerk of Court using the CM/ECF system which will send notification of such filings(s) to counsel of record.

Respectfully submitted,


\_\_\_/s/ Benjamin Donahue_____
Benjamin N. Donahue
Attorney for Plaintiffs and Class Members
HALLETT WHIPPLE WEYRENS
Six City Center
P.O. Box 7508
Portland, ME 04112-7508
(207) 775-4255
bdonahue@hww.law

48