**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| KATHERINE VEILLEUX,  JENNIFER CHON, ROCKY COAST FAMILY ACUPUNCTURE, P.A., and JAMES TILTON, individually and on behalf of all others similarly situated, <br><br> Plaintiffs <br><br> v. <br><br> ELECTRICITY MAINE, LLC, PROVIDER POWER, LLC, SPARK HOLDCO, LLC, KEVIN DEAN and EMILE CLAVET <br><br> Defendants | **CASE NO:  1:16-cv-571-NT** |

**DEFENDANTS' MOTION TO COMPEL ARBITRATION**
**OF CLAIMS BROUGHT BY PLAINTIFF JAMES TILTON**

Defendants Electricity Maine, LLC ("Electricity Maine") and Spark Holdco, LLC ("Spark") (collectively, "Defendants") move for an Order compelling Plaintiff James Tilton to arbitrate his claims against Defendants as set forth in Plaintiffs' Third Amended Complaint (the "Complaint").  As grounds for this Motion, Defendants state as follows.

## INTRODUCTION

In response to a door-to-door sales solicitation on November 26, 2017, James Tilton voluntarily and knowingly enrolled with Electricity Maine for electric supply at his residence in Bath, Maine.  Tilton entered into a valid and binding contract with Electricity Maine, pursuant to which he agreed to be bound by Electricity Maine's Terms of Service.  Those Terms of Service expressly state that any claim arising out of Tilton's contract with Electricity Maine must be submitted to binding arbitration.  Tilton concedes that the door-to-door salesman through whom he enrolled did *not* represent that he worked for, or was affiliated with, Central Maine Power ("CMP"), and in fact Tilton was expressly informed to the contrary; Tilton admits that he understood he was enrolling with Electricity Maine for electric supply at a fixed price for a definite term; and Tilton agreed to be bound by Electricity Maine's Terms of Service.  Accordingly, Defendants request that this Court enter an Order compelling Tilton to arbitrate his claims against Defendants, and dismissing Tilton's claims from this civil action.

## I.       PROCEDURAL HISTORY AND FACTS

### A.       Relevant Procedural History.

On May 30, 2018, Plaintiffs filed a motion for leave to amend further their Second Amended Complaint (ECF No. 81), seeking, among other things, to add Tilton as a Plaintiff and sole representative of a proposed sub-class asserting claims related to door-to-door sales of residential electricity supply by Electricity Maine to consumers in Maine.  Defendants opposed this motion on several grounds (ECF No. 89), one of which was that Tilton is barred from

pursuing his claims in this Court because he agreed to arbitrate them on an individual basis pursuant to a provision in his contract with Electricity Maine. In their reply brief (ECF No. 96) and in a motion to strike (ECF No. 95), Plaintiffs argued that no contract was ever formed between Tilton and Electricity Maine.

In November 2018, the Court notified the parties of its intention to schedule an evidentiary hearing on the question of whether the arbitration provision in Tilton's contract with Electricity Maine was enforceable. As framed by the Court, the answer to that question depended on "whether there was really a contract between Mr. Tilton and Electricity Maine." *See* ECF No. 119-2 (November 9, 2018 Transcript at 12:10-17). The Court scheduled the evidentiary hearing for December 18, 2018.

At the December 18 hearing, rather than take evidence on the motions then pending, the Court granted Plaintiffs' motion to amend their complaint, thus making the Third Amended Complaint, including Tilton's newly alleged claims against Defendants, the operative pleading, and allowed Defendants until February 14, 2019 to file a motion to compel arbitration of those claims under the Federal Arbitration Act ("FAA"). Defendants now so move.

**B.      Tilton's Enrollment and Contract with Electricity Maine.**

       **1.      Electricity Maine's Door-to-Door Sales Program.**

Electricity Maine began its door-to-door sales program on January 14, 2017. Declaration of John Bejger ("Bejger Dec.") ¶ 4. Electricity Maine contracted with vendors which, as independent contractors, supplied salespersons to conduct door-to-door sales on behalf of Electricity Maine. *Id.* ¶ 5. Those salespersons were employed and compensated by those vendors, not by Electricity Maine. *Id.*; Affidavit of Caleb Scribner ("Scribner Aff.") ¶ 3.

Electricity Maine contracted with D2D Masters, LLC as a vendor for its door-to-door sales program during November 2017. Bejger Dec. ¶ 6. As part of its door-to-door sales program,

Electricity Maine provided its vendors, including D2D Masters, LLC, with training materials to train salespersons selling electricity supply for Electricity Maine. *Id.* ¶ 6 at Ex. A § 2.3.3. Electricity Maine required its vendors to ensure that all salespersons selling on behalf of Electricity Maine passed a criminal background check and a drug screening test. *Id.* ¶ 6 at Ex. A § 2.5(i) – (vi). Door-to-door sales agents selling for Electricity Maine were also required to wear photo identification badges. *Id.* ¶ 7; *id.* ¶ 6 at Ex. A § 2.3.6.

Door-to-door enrollments for Electricity Maine were verified by an independent third party, Calibrus, and those telephone conversations were recorded. *Id.* ¶ 8. The role of this third-party verification ("TPV") process was to ensure that the customer voluntarily entered into a contract with Electricity Maine; that the customer understood the rate and term of the contract; that the customer understood that Electricity Maine was not affiliated with any utility, such as CMP; and that the customer agreed to be bound by Electricity Maine's Terms of Service, which were mailed to the customer with notice of the opportunity to rescind the contract. *Id.*

### 2.   Tilton Enrolled with Electricity Maine on November 26, 2017.

On November 26, 2017, a door-to-door sales agent selling electric supply on behalf of Electricity Maine, Caleb Scribner, visited Tilton's residence at 37 Office Drive, Bath, Maine. Scribner Aff. ¶ 4. Tilton answered the door and invited Scribner into his home. Deposition of James Tilton ("Tilton Dep.") at 80-81.[1] Scribner was well-dressed and polite. Tilton Dep. at 82; Tilton Dep. Ex. 10A at p. 2; Scribner Aff. ¶ 6. A copy of the template badge that would have been issued to Scribner prior to November 26, 2017 stated conspicuously that Scribner was *not* affiliated with any local utility, such as CMP. Bejger Dec. ¶ 7 and Ex. B ("***We are NOT part of the local utility***"); Scribner Aff. ¶ 6.

---

[1] Cited testimony and exhibits from the Tilton deposition are attached to the Declaration of Katherine Kayatta filed herewith.

It was Scribner's usual practice to tell prospective customers that he was selling electricity supply contracts on behalf of Electricity Maine, and to explain that customers did not have to purchase their electric supply from CMP, but could choose to purchase it from another provider, such as Electricity Maine. Scribner Aff. ¶ 5. Scribner did not tell potential customers, including Tilton, that he worked for or on behalf of CMP or any other utility. *Id.* ¶ 7; Tilton Dep. at 110-111. If a customer asked Scribner if he worked for or represented CMP, Scribner would confirm that he was a representative of Electricity Maine. Scribner Aff. ¶ 7. Moreover, Scribner did not tell customers that they would achieve any specific cost savings by enrolling with Electricity Maine. *Id.* ¶ 8. Instead, Scribner told prospective customers that Electricity Maine offered a fixed price for electricity supply guaranteed for a certain period of time, consistent with the information provided to the customer during the TPV process. *Id.* Scribner informed customers that Electricity Maine's fixed price would protect them from price increases above that rate for the duration of their contract with Electricity Maine. *Id.*

Tilton opted to purchase one of Electricity Maine's electricity supply contracts at a fixed rate of $0.0969/kWh for a 24-month term. Tilton Dep. at 85-89, 93-94. At the time Tilton enrolled with Electricity Maine, he was aware of energy deregulation in Maine and "absolutely" understood that he had alternatives to the annual Standard Offer price offered by CMP for his residential electricity supply. Tilton Dep. at 53. Tilton had previously contracted with another competitive electricity provider ("CEP") for his electricity supply and understood how to compare the rate offered by a CEP to the Standard Offer rate. Tilton Dep. at 25-27.[2] Tilton also testified,

---

[2] Tilton received an offer in the mail approximately three or four years ago from this other CEP, and contacted them to enroll. Tilton Dep. at 25-26. In evaluating whether to switch from Standard Offer service to this CEP, Tilton compared the price he was paying per kilowatt hour under the Standard Offer to the price per kilowatt hour and contract term being offered by the CEP. *Id.* at 27. He made this comparison by looking at his CMP bill to compare the rate he was paying with the rate being offered by the CEP. *Id.* At some point after enrolling with this CEP, Tilton terminated his contract and went back to Standard Offer service through CMP. *Id.* at 67-68.

however, that the rate he pays for his electricity supply at any given time is itself "not important to [him]." Tilton Dep. at 25.[3]  More important, Tilton said, is ensuring the long term predictability and stability of the rate he pays. Tilton Dep. at 44-45, 78.

On November 26, 2017, after Tilton expressed interest in enrolling in Electricity Maine's 24-month plan at a fixed price of $0.0969 per kilowatt hour (kWh), Scribner initiated the TPV process for Tilton. Tilton Dep. Ex. 4 & 4A. As was Scribner's usual practice, Scribner would have asked Tilton for a CMP bill so that he could identify his utility account number. Scribner Aff. ¶ 9. Scribner then called Calibrus, identified himself by an agent identification number, and provided the Calibrus agent with pertinent information for the sale, including Tilton's name, telephone number, and utility account information. Tilton Dep. Ex. 4 & 4A; Scribner Aff. ¶ 9. The Calibrus agent then called Tilton directly on his phone and spoke with him personally, walking him through the verification process. Tilton Dep. at 85-89; Tilton Dep. Ex. 5 & 5A; Scribner Aff. ¶ 9. The conversation between Tilton and the Calibrus agent included the following exchange:

> **Agent**:   You are enrolling in the 100 percent green 24 month plan and will be charged 9.69 cents per kilowatt hour. On your bill Electricity Maine will be noted as your electric supplier. Following the 24 month term your service will continue at a month to month variable rate unless you choose to re-enroll or cancel, do you understand?

---

[3] As Tilton testified at his deposition:

| | |
|---|---|
| **Q:** | So as of today, you believe you're paying approximately 6 cents per kilowatt hour for your residential electricity supply to CMP? |
| **A:** | **The last time I checked that's what I was paying.** |
| **Q:** | And when was that, the last time you checked? |
| **A:** | **Over a year ago.** |
| **Q:** | So you haven't looked at the rates— |
| **A:** | **Correct.** |
| **Q:** | --since over a year ago? Have your bills – |
| **A:** | **It's not important to me.** |
| **Q:** | What's not important to you? |
| **A:** | **The rate.** |
| **Q:** | Is how much you're paying per month to CMP important to you? |
| **A:** | **No.** |

Tilton Dep. at 24-25.

| | | |
|---|---|---|
| **Tilton**: | Yes. | |
| **Agent**: | You will receive Electricity's Maine's – Maine's Terms of Service and your Consumer Bill of Rights by mail re-confirming everything we have discussed here today. You will have five business days from your receipt of these terms and conditions to cancel your enrollment by calling Electricity Maine at 1-866-573-2674 and go back to Central Maine Power for electric service. If you cancel later there is an early termination fee of $100. Do you understand your right to cancel? | |
| **Tilton**: | Yes. | |
| **Agent**: | By choosing Electricity Maine as your supplier you will remain a customer of Central Maine Power for delivery services and Central Maine Power will still read your meter, bill you, and you should be contacted in case of an emergency.  Do you understand that Electricity Maine is not Central Maine Power or an affiliate of Central Maine Power but a participating supplier in Central Maine Power's energy choice program, correct? | |
| **Tilton**: | Yes. | |
| **Agent**: | Thank you for choosing Electricity Maine, Mr. Tilton. Your verification number is 417776. Thank you and you have a great day, goodbye. | |
| **Tilton**: | Keep smiling. | |

Tilton Dep. Ex. 5 & 5A at p. 2.  Tilton admits that it is his voice on the recording; that the recording accurately represents the conversation that occurred on November 26, 2017; and that he clearly stated he understood what was being asked of him by the Calibrus agent on the telephone call.  Tilton Dep. at 85-88.  Tilton further admits that the Calibrus agent informed him during the telephone call that he was enrolling with Electricity Maine, and Electricity Maine was not CMP or an affiliate of CMP, and that he acknowledged that he understood all of that.  *Id.* at 111-112.

> **3.      On November 28, 2017, Electricity Maine Mailed Tilton a Letter Confirming his Enrollment and Enclosing his Contract Terms of Service.**

In November 2017, Electricity Maine's Auburn, Maine location was responsible for mailing out a letter with contractual Terms of Service enclosed to each new customer who enrolled through door-to-door sales.  Declaration of Sandra Nadeau ("Nadeau Dec.") ¶ 3.  During this time, if the TPV telephone call between Calibrus and the enrolling customer was successfully completed, a process was immediately set in motion to complete that customer's enrollment.

Bejger Dec. ¶ 9.  Each night, Calibrus uploaded onto an FTP site information for all of Electricity Maine's verified door-to-door sales for that day.  *Id.*  In November 2017, door-to-door enrollment data for Electricity Maine was pulled from the FTP site on a daily basis, loading it into a computer application called SCOUT.  *Id.* ¶ 10.  SCOUT sent the enrollment data to another application called Utilibill, which in turn automatically ran daily reports and sent the report data to a database called TESLA.  *Id.*  Each day, a table of enrollments from the prior day was automatically created in TESLA.  *Id.*

On each business day during November 2017, Electricity Maine employee Julie Jacques, who worked at the Auburn, Maine location, navigated on one of the office computers to corp.providerpower.com, a secure internal website that interfaced with TESLA.  Nadeau Dec. ¶ 3. Jacques then selected the product or company (Electricity Maine) on the screen, and selected "Batch Enrollment" report, then clicked a "submit" button.  *Id.* ¶ 4.  This opened Microsoft Report Services, which would generate a Batch Enrollment Report.  *Id.*  The Batch Enrollment Report contained each day's welcome letters for newly enrolled customers.  *Id.* ¶ 5.  The welcome letters confirmed the customer's enrollment with Electricity Maine, and included with each letter was a copy of Electricity Maine's contractual Terms of Service.  *Id.*

On the same business day, Jacques printed these letters from Microsoft Report Services. *Id.* ¶¶ 3-6.  She then loaded the printed letters with Terms of Service for each into an envelope stuffing machine, and then a postage meter machine.  *Id.* ¶ 6.  Jacques then put all of the stuffed and posted envelopes into a box, and carried them to the U.S. post office next door, where she placed the welcome letters with Terms of Service in the U.S. mail for delivery to customers.  *Id.* ¶¶ 6, 7 & Ex. A.  If Jacques was not in the office to perform this process, her designated backup was Electricity Maine employee Jaime Geoffroy.  *Id.* ¶ 8.  Geoffroy would perform the same process for mailing the welcome letters and Terms of Service in Jacques's absence.  *Id.*

On November 28, 2017, Electricity Maine followed the above-described procedure and printed the daily Batch Enrollment Report, which included a letter to Tilton along with his copy of Electricity Maine's contractual Terms of Service. *Id.* ¶ 9. Consistent with the information supplied by Tilton during the enrollment process, his letter was addressed to 37 Office Road, Bath, Maine, the mailing address associated with his CMP account. *Id.* His letter, along with all letters going out in that day's batch, along with the Terms of Service, were mailed to him by Electricity Maine consistent with the process described above on November 28, 2017 . *Id.* ¶ 9 & Ex. B. Tilton's letter was not returned to Electricity Maine by the U.S. post office. Bejger Dec. ¶ 12.

Electricity Maine's Terms of Service mailed to Tilton on November 28, 2017 contain the following arbitration provision:

> 21. **Mandatory Arbitration.** Any claim, dispute or controversy, regarding any contract, tort, statute, or otherwise ("Claim"), arising out of or relating to this Agreement or the relationships among the parties hereto shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Commercial or Consumer rules, as applicable, in effect at the time the Claim is filed ("AAA Rules"). Copies of the AAA Rules and forms can be located at www.adr.org, or by calling 1-800-778-7879. The arbitrator's decision shall be final, binding, and non-appealable. Judgment upon the award may be entered and enforced in any court having jurisdiction. This clause is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act. Neither party shall sue the other party other than as provided herein or for enforcement of this clause or of the arbitrator's award; any such suit may be brought only in Federal District Court for the District, or if any such court lacks jurisdiction, in any state court that has jurisdiction. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement including any claim that all or any part of the Agreement is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver".

Nadeau Dec. at Ex. B at p. 7 of 9. The Terms of Service provided to Tilton were in effect for new and reenrolling customers who contracted with Electricity Maine on or after October 24, 2016. Declaration of Sandra Nadeau dated July 6, 2018 (ECF No. 89-1) ("2018 Nadeau Dec.") ¶ 9. In late 2017, the Terms of Service were amended to the current version still in effect today, which contains a similar arbitration provision. *Id.* ¶ 11.

Despite being explicitly told on the TPV enrollment call that he would receive Electricity Maine's Terms of Service by mail, and that he would have a limited period of time to rescind his

contract with Electricity Maine upon receiving those Terms of Service, Tilton Ex. 5 & 5A at p. 2, Tilton never contacted Electricity Maine about not receiving those Terms of Service, Tilton Dep. at 99.  Moreover, Tilton's usual practice is to throw away, without opening, *any mail* that he does not recognize.[4]  Tilton Dep. at 50.  Tilton admits that he could have received the letter with the Terms of Service from Electricity Maine, but thrown it away without opening it.  Specifically, Tilton testified at his deposition:

> **Q:** And my question was do you know if you ever received the Terms of Service, and your answer was –
>
> **A: Not that I recognized as such.**
>
> **Q:** Okay.  So it's possible if it came to you in an envelope that was unfamiliar with you, you just threw it aware [sic]?
>
> **A: I would – if it came in – came to me in an envelope from CMP, I would have looked at it.  Otherwise, I would have no reason to look at it.**
>
> **Q:** And you may have thrown it away?
>
> **A: That's true.**

Tilton Dep. at 98-99.

### 4.    Tilton Contacted Electricity Maine on January 16, 2018, to Terminate his Service.

On January 16, 2018, Tilton contacted Electricity Maine to terminate his contract.  Tilton Dep. at 99-102; Tilton Dep. Ex. 10 & 10A; 2018 Nadeau Dec. ¶ 12.  Electricity Maine waived the $100 early termination fee because Tilton told the customer service representative that Scribner "led us to believe that he was a member of Central Maine Power," Tilton Dep. Ex. 10 & 10A,

---

[4] As Tilton testified at his deposition:

> **Q:** So you – as we saw with the one example of the alternate electricity supplier other than Electricity Maine that you dealt with, you periodically receive sales offers in the mail, correct?
>
> **A: Most of them go in the trash without opening them.**
>
> **Q:** So if you get – I guess junk mail is the typical term for it.
>
> **A: If I –**
>
> **Q:** If you don't recognize –
>
> **A: If I don't, it goes straight in.  I don't even bother.**

Tilton Dep. at 50.

however Tilton admitted at his deposition that Scribner never represented that he was from CMP, Tilton Dep. at 110-111; Scribner Aff. ¶¶ 6, 7. In addition to waiving the $100 early termination fee, Electricity Maine also mailed Tilton a $100 Visa gift card to compensate him for any amount he paid above the Standard Offer price during the brief period he was a customer.  2018 Nadeau Dec. at ¶ 12; Tilton Dep. Ex. 10 & 10A.  Tilton "forgot about" the $100 gift card, however, Tilton Dep. at 112, and likely threw it in the trash without opening it when it arrived, consistent with his practice concerning mail he did not recognize, *id.* at 50.

## II.     ARGUMENT

### A.     Tilton and Electricity Maine Entered into an Enforceable Contract.

In determining whether Tilton and Electricity Maine formed a valid contract, Maine law applies.  *See Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 376 (1st Cir. 2011) ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.").  Under Maine law, "[a] contract exists when the parties 'mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite.'"  *McClare v. Rocha*, 2014 ME 4, ¶ 16, 86 A.3d 22 (quoting *Sullivan v. Porter*, 2004 ME 134, ¶ 13, 861 A.2d 625).

### 1.     On November 26, 2017, Tilton Agreed to be Bound by Electricity Maine's Terms of Service.

During the November 26, 2017 TPV call with the Calibrus agent confirming his enrollment (Tilton Dep. Ex. 5 & 5A), Tilton stated unequivocally that he understood he was entering into a contract with Electricity Maine to purchase electric supply at a fixed rate of 9.69 cents per kWh for a 24-month term.  Tilton Dep. at 85-88.  Tilton understood that Electricity Maine was not affiliated with CMP, and that by enrolling Tilton would be electing to purchase his electric supply from Electricity Maine, rather than paying the Standard Offer through CMP.  *Id.* at

85-89, 111-112.  Tilton also understood Electricity Maine's Terms of Service would be mailed to him, after which he would have a limited period of time from receipt of those Terms of Service to cancel his contract by contacting Electricity Maine to rescind.  *Id.* at 88; Tilton Dep. Ex. 5 & 5A.

Tilton's assent to be bound by the Terms of Service was expressly stated on the telephone call with the Calibrus agent.  Material contract terms such as price and length of the contract were confirmed and agreed to on the call, and Tilton expressly stated that he understood he would have an additional period of time after receipt of the written contract to rescind his agreement with Electricity Maine if any additional material terms set forth in Electricity Maine's Terms of Service were not acceptable to him.

### 2. Electricity Maine Mailed Tilton's Terms of Service to Him, and Tilton Did Not Rescind his Contract.

#### a. There is a Rebuttable Presumption Tilton Received the Terms of Service.

As promised on the telephone call between Tilton and the Calibrus agent, Electricity Maine mailed its Terms of Service to Tilton on November 28, 2017 – two days after he enrolled. It is well settled that "if a letter properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed, from the known course of business in the post-office department, that it reached its destination at the regular time, and was received by the person to whom it was addressed."  *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884).  Since *Rosenthal*, federal and state courts routinely apply this common law presumption, known as the "mailbox rule," that properly mailed documents are received in due course by the addressee or after a normal interval (*e.g.*, two or three days).  *See, e.g.*, *In re Cendant Corp. Prides Litig.*, 311 F.3d 298, 304 (3d Cir. 2002); *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996-97 (5th Cir. 1989).  The First Circuit is no exception.  *See Narragansett Indian Tribe v. Warwick Sewer Auth.*, 334 F.3d 161, 168 (1st Cir. 2003) (Tribe failed to rebut common law presumption when Authority

testified that documents were mailed with return addresses and were never returned); *Khath v. Midland Funding LLC*, 334 F. Supp. 3d 449, 514-15 (D. Mass 2018) (applying presumption of receipt to prove existence of agreement).  Maine courts, similarly, apply the presumption of receipt.  *See State v. Cannady*, 2018 ME 106, ¶ 14, 190 A.3d 1019 ("It has long been the law in this jurisdiction that proof of mailing raises a *presumption of receipt*." (quoting another source)); *see also* Field & Murray, *Maine Evidence* § 301.2 at 64 (6th ed. 2007) ("[A] [l]etter deposited in the mail properly addressed and stamped is presumed to have been received.").

Moreover, a party need not have direct evidence of mailing to be entitled to the presumption.  Placing letters in the mail may be proved by circumstantial evidence, including customary mailing practices of the sender.  *See Wells Fargo Bus. Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 944 (5th Cir. 1983) (testimony regarding procedure used for mailing, seeing letter in the envelope being sealed, and no return mail sufficient to trigger presumption); *Simpson v. Jefferson Standard Life Ins. Co.*, 465 F.2d 1320, 1324 (6th Cir. 1972) ("[F]ederal courts recognize that proof of a business system of preparing and mailing letters, and compliance with such a custom in the particular instance, is sufficient to establish proof of mailing.").  "To invoke the presumption, proof of procedures followed in 'the regular course of operations' gives rise to a strong inference that it was properly addressed and mailed." *Gedid v. Huntington Nat. Bank*, No. CIV.A. 11-1000, 2012 WL 691637, at *6 (W.D. Pa. Feb. 10, 2012), *report and recommendation adopted*, No. CIV.A. 11-1000, 2012 WL 691614 (W.D. Pa. Mar. 2, 2012) (quoting *Godfrey v. United States*, 997 F.2d 335, 338 (7th Cir. 1993)).

To rebut this presumption of receipt from mailing, a party typically must provide "some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable." *Meckel v. Continental Resources Co.*, 758 F.2d 811, 817 (2d Cir. 1985) (cited by the First Circuit in *U.S. Fire Ins. Co. v.*

*Producciones Padosa, Inc.*, 835 F.2d 950 n.2 (1st Cir. 1987)).   Generally, a party's denial of receipt alone is not enough to overcome the presumption.  *See Discover Bank v. Vaden*, 489 F.3d 594, 607 (4th Cir. 2007), *rev'd on other grounds*, 556 U.S. 49 (2009); *Spivey v. Adaptive Marketing LLC*, 622 F.3d 816, 820 (7th Cir. 2010) (holding that plaintiff's unclear deposition testimony when asked whether he actually received defendant's welcome kit supported a presumption that the welcome kit actually was received); *Fed. Kemper Life Assurance Co. v. Ellis*, 28 F.3d 1033, 1040 (10th Cir. 1994); *Meckel*, 758 F.2d at 817 ("The mere denial of receipt does not rebut that presumption."); *Wold v. Dell Fin. Servs., L.P.*, 598 F. Supp. 2d 984, 988 (D. Minn. 2009) ("Denial of receipt of an agreement with an arbitration clause is not sufficient to overcome the presumption of receipt."); *State v. Kovtuschenko*, 521 A.2d 718, 719 (Me. 1987) (stating that denial of receipt of notice is insufficient to generate reasonable doubt on the element of mailing).

Electricity Maine followed the same procedure every business day in November 2017, including during the time Tilton enrolled, to generate, print, and mail letters and Terms of Service to customers who enrolled through the door-to-door salesperson and TPV process.  On November 28, 2019, Electricity Maine's regular course of business operations was to follow the procedure as described in detail in Section I(A)(3), *supra*, ultimately hand-delivering Tilton's letter with enclosed Terms of Service to the post office adjacent to Electricity Maine's offices and placing it into the U.S. mail, properly addressed.  Applying the "mailbox rule," the letter is presumed to have reached its destination at Tilton's home at 37 Office Drive, Bath, Maine.  Further, Electricity Maine has no record that Tilton's letter was returned to it as undeliverable.  Bejger Dec. ¶ 12.

There is no evidence from which this Court could find that Tilton has met his burden in rebutting the presumption that he received the enrollment letter and contractual Terms of Service. In fact, Tilton admits he may have received Electricity Maine's enrollment letter and the Terms of

Service but threw them away without opening them, Tilton Dep. at 50, 98-99, undercutting any conclusory assertion that he did not receive them.

> **b.     Tilton's Terms of Service Are Enforceable when Tilton had the Opportunity to Review the Terms of Service and Rescind the Contract.**

Once Tilton received his Terms of Service, he had five business days to contact Electricity Maine and rescind his contract, thereby cancelling his enrollment.[5]  Tilton acknowledged that five-day rescission period on the TPV call with Calibrus, Tilton Dep. Ex. 5 & 5A, yet in the days that passed after his enrollment, he did not contact Electricity Maine to inquire about his enrollment, to ask where his letter and Terms of Service were, or to rescind his contract, Tilton Dep. at 99. Failing to exercise his option to rescind within five business days after receipt of the Terms of Service, Tilton was bound by the terms of his contract with Electricity Maine, including the arbitration provision.

It is not uncommon for consumers to contract for goods or services in the manner that Tilton did, and such contracts are properly formed and enforceable.  For example, in *Vernon v. Quest Commc'n Intern., Inc.*, 857 F. Supp. 2d 1135 (D. Colo. 2012), *aff'd*, 925 F. Supp. 2d 1185 (D. Colo. 2013), the United States District Court for the District of Colorado held that the plaintiff, who subscribed for internet service from the defendant, had reasonable notice of the agreement and the arbitration clause and granted the defendant's renewed motion to compel arbitration.  *Vernon* involved a click-through process in which the subscriber agreed to certain terms on the computer screen without having actually read them.   "While the Subscriber Agreement and arbitration clause may not have been physically presented to each Plaintiff and did

---

[5] Per Maine PUC regulations in effect at the time, CEPs "must provide customers a minimum of five calendar days from the provision of the Terms of Service document to exercise the right of rescission. . . . Competitive Electricity Providers must provide customers a minimum of 8 calendar days if the Terms of Service document is mailed to the customer."  65-407 C.M.R. ch. 305, § 4(B)(2) (2015).  Electricity Maine's rescission period of five days from *receipt* of the Terms of Service built in that additional time for mailing.  Tilton's enrollment was not effective until the rescission period expired.  *See id.* § 4(B)(2)(d).

not automatically appear on the subscriber's computer screen during the software installation process, those terms and conditions were not hidden or difficult to find." *Id.* at 1151 (footnote omitted). The defendant sent plaintiff a welcome letter confirming enrollment, and referring the plaintiff to review the complete contractual terms online. *Id.* at 1150. The courts stated, "at that point they were fully capable of finding the Subscriber Agreement and arbitration provision on the Qwest website." *Id.* (citing *Wildman v. Pacific Coast Indep. Brokerage, Inc.,* 16 Fed. App'x. 741, 742–44 (9th Cir. 2001) (district court did not err in compelling arbitration where non-movant failed to read documents containing arbitration provisions and had reasonable opportunity to discover the terms of the contract)); *Elsken v. Network Multi–Family Sec. Corp.,* 49 F.3d 1470, 1473–74 (10th Cir. 1995) (holding that plaintiff remained bound by provisions in a Services Agreement even though she did not read the contract)).

Indeed, these circumstances were analyzed fully in *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997). There, Judge Easterbrook writing for the Seventh Circuit described the situation as follows:

> A customer picks up the phone, orders a computer, and gives a credit card number. Presently a box arrives, containing the computer and a list of terms, said to govern unless the customer returns the computer within 30 days. Are these terms effective as the parties' contract, or is the contract term-free because the order-taker did not read any terms over the phone and elicit the customer's assent?

*Id.* at 1148. In answering this question, the Seventh Circuit concluded that the arbitration provision contained in the terms and conditions sent after the customer purchased the computer was valid and enforceable. *Id.* "A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome." *Id.* "Customers as a group are better off when vendors skip costly and ineffectual steps such as telephonic recitation, and use instead a simple approve-or-return device. Competent adults are bound by such documents, read or unread." *Id.* at 1149.

The analyses in *Vernon* and *Gateway* guide this Court's analysis here.  As in those cases, like others,[6] Tilton understood that he would be bound by Electricity Maine's Terms of Service— as explicitly stated on the telephone call with the Calibrus agent.  Tilton Dep. 85-88; Tilton Dep. Ex. 5 & 5A at p. 2.  Thereafter, Electricity Maine mailed Tilton his welcome letter and the Terms of Service, which reiterated that Tilton had a limited period of time to rescind his contract with Electricity Maine and cancel his enrollment.  Nadeau Dec. ¶ 9 & Ex. B at p. 7 of 9.  Indeed, Tilton was informed of his right to rescind the contract with Electricity Maine on the phone with the Calibrus agent, Tilton Dep. Ex. 5 & 5A at p. 2; Tilton Dep. at 99; in Electricity Maine's contract disclosure letter, Nadeau Dec. ¶ 9 & Ex. B at p. 3 of 9; and in the Terms of Service, Nadeau Dec. ¶ 9 & Ex. B at p. 6 of 9 (§ 12).  Tilton manifested his assent to enroll with Electricity Maine and thereby be bound by the Terms of Service, including the arbitration provision and class action waiver, by failing to timely rescind the agreement.  As stated by Judge Easterbrook in *Gateway*, it is of no moment that Tilton failed to read the arbitration provision because he threw away the Terms of Service without reading them.  Tilton Dep. at 50, 98-99.  What is important is that Tilton had the opportunity to review the Terms of Service, and he failed to do so.

Accordingly, Tilton entered into a valid and enforceable contract with Electricity Maine.

## B.      The Terms of Service Contain an Enforceable Arbitration Provision.

Under the FAA, "[a] written provision in any . . . contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order

---

[6] *See, e.g.*, *Dye v. Tamko Bldg. Prod., Inc.*, 908 F.3d 675, 682–83 (11th Cir. 2018); *Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002); *Higgs v. Auto. Warranty Corp. of Am.*, 134 F. App'x 828, 832 (6th Cir. 2005).

directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "The FAA allows one party to an arbitration agreement to ask the court to put the litigation on hold and force the other party to arbitrate the disputes." *Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200, 207 (1st Cir. 2019). "At base, it respects arbitration as 'a matter of contract' between parties and doesn't allow courts to jump in when the parties agreed to keep the courts out of the mix." *Id.* (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019)).

Federal courts will compel arbitration pursuant to the FAA when "(i) there exists a written agreement to arbitrate, (ii) the dispute falls within the scope of that arbitration agreement, and (iii) the party seeking an arbitral forum has not waived its right to arbitration." *Ceder v. Securitas Security Services USA Inc.*, No. 1:17-CV-00422-NT, 2018 WL 2210426 (D. Me. May 14, 2018) (internal quotations omitted) (citing *Combined Energies v. CCI, Inc.*, 514 F.3d 168, 171 (1st Cir. 2008)). Applying the above factors in this case, there can be no dispute that arbitration of Tilton's claims is required pursuant to the FAA.

### 1.     A Written Agreement to Arbitrate Exists.

As explained in Section II(A)(1)-(2), *supra*, a written agreement to arbitrate exists between Tilton and Electricity Maine. Tilton agreed to binding arbitration in November 2017 when he enrolled with Electricity Maine and thereafter failed to exercise his option to rescind the contract, including the provision that "Any claim, dispute or controversy, regarding any contract, tort, statute, or otherwise . . . arising out of or relating to this Agreement or the relationships among the parties hereto shall be resolved . . . through binding arbitration." Nadeau Dec. at ¶ 9 and Ex. B at p. 7 of 9.

The arbitration provision, even though not expressly disclosed during the TPV call, is enforceable because Tilton agreed to be bound by all terms as set forth in the Terms of Service,

which he understood would be subsequently sent to him, and which were indeed sent to him. *See* Section II(A)(2), *supra*. Under these facts, he thereby agreed to be bound by the arbitration provision. *See Vernon,* 857 F. Supp. 2d at 1151; *Gateway*, 105 F.3d at 1150-51; *Local Union 1253, Intern. Broth. Of Elec. Workers, AFL-CIO v. s/L Const., Inc.*, 217 F. Supp. 2d 125 (D. Me. 2002). In *Local Union 1253*, the Court considered whether the parties had entered into an agreement such that the arbitration clause contained in the agreement was enforceable. The court determined that the defendant manifested its intent to enter an agreement with the plaintiff and be bound by the terms of the agreement by signing the letter of assent. *Id.* at 134. The defendant's excuses for lack of formation failed. The court concluded that the defendant had "ample opportunity" to read the terms of the agreement, but at trial explained that he simply was in a "habit" of not reading agreements he signed. *Id.* at 135. Accordingly, the court held that the defendant "had failed to prove that the underlying agreement was never formed," and enforced the arbitration provision clause the agreement contained. *Id.*

In short, for the same reasons that a written contract exists between Electricity Maine and Tilton, *see* Section II(A)(1)-(2), *supra*, a written agreement to arbitrate exists, as well.

## 2. Tilton's Claims Fall Within the Scope of the Arbitration Agreement.[7]

The arbitration provision at issue states that "Any claim, dispute or controversy, regarding any contract, tort, statute, or otherwise . . . arising out of or relating to this Agreement or the relationships among the parties . . . shall be resolved . . . through binding arbitration." Nadeau Dec. at ¶ 9 and Ex. B at p. 7 of 9. *All* of Tilton's claims arise out of or relate to his decision to

---

[7] There is a broad presumption in favor of arbitration and any ambiguity concerning the arbitration agreement must be resolved in favor of arbitration. *Grand Wireless, Inc. v. Verizon Wireless, Inc.,* 748 F.3d 1, 7-8 (1st Cir. 2014). In order to deny a motion to compel arbitration, the Court must be able to say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *V.I.P., Inc.,* 2001 ME 73, ¶ 4, 770 A.2d 95 (quoting *Westbrook Sch. Comm. v. Westbrook Teachers Ass'n*, 404 A.2d 204, 208 (Me. 1979)).

enroll with Electricity Maine to purchase electric supply and his payments to Electricity Maine during the contract period.  Even if Plaintiffs disputed whether Tilton's claims fall within the scope of the arbitration provision in the Terms of Service, that is a question to be resolved by the arbitrator.  Arbitration agreements may include a clause in which the parties agree to delegate issues, including the validity and scope of the agreement itself, to the arbitrator (a "delegation clause").  Here, the arbitration provision includes a delegation clause, which states that "[t]he arbitrator, and not any federal, state, or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement including any claim that all or any part of the Agreement is void or voidable."  Nadeau Dec. at ¶ 9 and Ex. B at p. 7 of 9; *see Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-71 (2010) (finding such delegation clauses permissible); *see also Danley v. Encore Capital Grp., Inc., No.* 16-1670, 2017 WL 710470, at *3 (6th Cir. Feb. 22, 2017) (noting that pursuant to *Rent-A-Center*, the arbitrator decides the validity of an arbitration agreement if the agreement includes a valid delegation provision).  Because the arbitration provision in the Terms of Service contains a delegation clause, even if the scope of the agreement to arbitrate is ambiguous, which it is not, "the arbitrator gets to decide the scope of the arbitration clause," not the Court.  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019) (rejecting any "wholly groundless" exception for a court to intrude on the parties' decision to delegate questions of arbitrability); *Fusco v. Plastic Surgery Ctr., P.A.*, No. 2:15-CV-460-DBH, 2016 WL 845263, at *2 (D. Me. Mar. 4, 2016), *reconsideration denied*, No. 2:15-CV-460-DBH, 2016 WL 3077843 (D. Me. May 31, 2016).

### 3.   Defendants have not Waived their Right to Arbitrate.

Finally, Defendants have not waived their right to compel arbitration.  Defendants asserted the binding arbitration agreement as a defense even before Plaintiff's Third Amended Complaint

was allowed, and at the December 18, 2018 hearing, the Court, without objection by Plaintiffs, allowed Defendants until February 14, 2019 to move to compel arbitration of Tilton's claims.

## CONCLUSION

The facts relating to the binding contract between Tilton and Electricity Maine are straightforward. On November 26, 2017, Tilton was approached by Caleb Scribner, who was selling electric supply on behalf of Electricity Maine. Dressed professionally in a suit and tie, Scribner did not represent to Tilton that he was employed by or affiliated with CMP. Understanding the deregulation of electric energy in Maine, and having once before contracted with a CEP, Tilton enrolled with Electricity Maine through a TPV process where he affirmatively stated he understood the fixed rate that he was enrolling at and the term of his contract; that he was enrolling with Electricity Maine, which was not affiliated with CMP; that he would receive his Terms of Service by mail; and that he would have a limited amount of time to rescind his contract with Electricity Maine upon receipt of those Terms of Service. Two days later, Electricity Maine mailed Tilton's enrollment letter and Terms of Service, which Tilton admitted he likely tossed in the trash because he did not recognize the envelope.

A contract, including one with a valid arbitration provision as is the case here, need not be read to be enforceable. Tilton's lack of diligence in reading the Terms of Service mailed to him, despite being told that he would receive the Terms of Service by mail and that he would have a limited amount of time to rescind his contract with Electricity Maine upon such receipt, does not render his claims against Defendants immune from a valid and binding arbitration provision in those Terms of Service.

For the reasons stated above, Defendants request that the Court enter an Order compelling Plaintiff to arbitrate his claims against Defendants, and dismissing those claims from this civil action.

Dated at Portland, Maine this 14th day of February, 2019

/s/ John J. Aromando
John J. Aromando
Katherine S. Kayatta
Sara A. Murphy
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME  04101
Tel:  207-791-1100
jaromando@pierceatwood.com
kkayatta@pierceatwood.com
smurphy@pierceatwood.com

*Attorneys for Defendants Electricity Maine, LLC and Spark HoldCo, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2019, I electronically filed the foregoing document

using the CM/ECF system which will send the notification of such filing to counsel of record.

*/s/ John J. Aromando*
John J. Aromando
Pierce Atwood LLP
Merrill's Wharf
254 Commercial Street
Portland, ME  04101
Tel:  207-791-1100
jaromando@pierceatwood.com

*Attorney for Defendants Electricity Maine, LLC and*
*Spark HoldCo, LLC*